UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**FOR PUBLICATION ON
ELECTRONIC DATABASE ONLY**

| | |
|---|---|
| In re<br><br>LOUIS FREY COMPANY, INC.,<br><br>Debtor. | Chapter 7<br><br>Case No. 03-15297 (SMB) |
| MERRILL LYNCH BUSINESS FINANCIAL<br>SERVICES, INC.,<br>Plaintiff,<br><br>-- against --<br><br>AMERICAN REPROGRAPHICS COMPANY,<br>LLC, and BP INDEPENDENT<br>REPROGRAPHICS,<br>Defendant. | Adv. P. No. 03-91486 (SMB) |
| YANN GERON, as Trustee of the Estate of<br>Louis Frey Company, Inc.,<br>Plaintiff,<br><br>-- against --<br><br>AMERICAN REPROGRAPHICS COMPANY,<br>LLC, also d/b/a BP INDEPENDENT<br>REPROGRAPHICS,<br>Defendant. | Adv. P. No. 04-3365 (SMB) |
| AMERICAN REPROGRAPHICS COMPANY,<br>LLC, and BP INDEPENDENT<br>REPROGRAPHICS,<br>Counterclaim Plaintiffs,<br><br>--against--<br><br>YANN GERON, as Trustee of the Estate of<br>Louis Frey Company, Inc.,<br>Counterclaim Defendant,<br><br>and<br><br>MERRILL LYNCH BUSINESS FINANCIAL<br>SERVICES, INC.,<br>Additional Counterclaim Defendant. | |

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

STEVENS & LEE, P.C.
Attorneys for Plaintiff Yann Geron
485 Madison Avenue
New York, New York 10022

       Alec P. Ostrow, Esq.
       Walter Benzija, Esq.
       Jocelyn Keynes, Esq.
          Of Counsel.


ZEICHNER ELLMAN & KRAUSE LLP
Attorneys for Plaintiff Merrill Lynch Business
  Financial Services, Inc.
575 Lexington Avenue
New York, NY 10022

       Jantra Van Roy, Esq.
          Of Counsel.


EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendants American Reprographics
  Company, LLC and BP Independent Reprographics
750 Lexington Avenue, 8th floor
New York, NY  10022

       Ira G. Greenberg, Esq.
       Cathy Fleming, Esq.
          Of Counsel


HANSON, BRIDGETT, MARCUS, VLAHOS & RUDY, LLP
Attorneys for Defendants American Reprographics
  Company, LLC and BP Independent Reprographics
425 Market Street, 26th floor
San Francisco, CA  94105

       Richard J. Stratton, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

Yann Geron, the plaintiff and chapter 7 trustee (the "Trustee") of Louis Frey Company, Inc. (the "Debtor") and Merrill Lynch Business Financial Services, Inc. ("Merrill"), the Debtor's secured lender, commenced these adversary proceedings to recover damages from the affiliated defendants American Reprographics Company, LLC ("ARC") and BP Independent Reprographics ("BPI"). The defendants formerly managed the Debtor's business, and the plaintiffs charge, in substance, that the defendants destroyed the Debtor and then stole a substantial part of its business. The parties consented to the core jurisdiction of this Court. (Joint Pre-Trial Order, dated Dec. 13, 2005, at § B, at 3) ("JPTO") (ECF Doc. # 58.)

The Court conducted a six-day bench trial in April 2006. In the main, the Court finds that ARC terminated its management agreement with the Debtor on September 15, 2003, and thereafter misappropriated the Debtor's confidential customer information, improperly diverted the Debtor's business and destroyed the Debtor's ability to operate. As a result, the defendants are jointly and severally liable to the Estate for damages in the sum of $9,061,793, plus interest at 9% per annum from September 15, 2003, to the date of the entry of judgment. In addition, the Estate is entitled to recover $2 million in punitive damages, and an additional amount consistent with the stipulation settling the preference actions. Lastly, Merrill's claims and ARC's remaining counterclaim are dismissed.

# BACKGROUND[1]

## A.    The Parties

At all relevant times prior to the bankruptcy filing, the Debtor was a privately-held New York corporation engaged, <u>inter alia</u>, in the reprographics business, <u>i.e.</u>, the business of creating specialized commercial blueprint reproductions for architects, engineers and contractors.  (JPTO ¶ 1.)[2]  Seymour Wiener ("Wiener") was the Debtor's president and sole shareholder.  (JPTO ¶ 3.)  The Debtor had a presence in the east coast reprographics market and some of its customers had been with the Debtor for more than 30 years.  (JPTO ¶ 6.)  At one time, the Debtor had over 300 employees nationwide, and counted various governmental agencies, utilities, architectural and engineering firms, and construction companies as its customers.  (JPTO ¶ 7.)

The Debtor provided reprographic services in one of two ways.  First, it leased reprographic equipment and placed it at a customer's place of business.  The Debtor sometimes provided on-site service personnel at the customer's location to operate, maintain and service the equipment on either a full-time or as-needed basis.  These on-site services are commonly referred to in the reprographics industry as Facilities Management ("FM") services.  (JPTO ¶ 4; Tr. (4/3 AM) 97-98.)  Second, the Debtor provided reprographic services at its business headquarters located at 902 Broadway in New York City.  (JPTO ¶¶ 2, 5.)

---

[1]    The following conventions are used in citing to the trial record.  With one exception, the daily transcript is cited by date and page.  For example, "Tr. (4/5) 10" refers to page 10 of the April 5, 2006 transcript.  Because the transcripts of the morning and afternoon sessions on April 3, 2006 were paginated separately, they are designated, respectively, as "AM" and "PM."  "PX" refers to the plaintiffs' trial exhibits and "DX" refers to the defendants' trial exhibits.  The parties have also designated portions of deposition testimony, and some of that testimony is cited in this opinion.  Any objections to such testimony that were raised during the depositions are overruled.

This opinion also contains references to documents filed on the Court's Electronic Case Filing System.  If the document is filed in the Trustee's adversary proceeding (# 04-3365), the opinion refers only to the docket number.  If the document is filed in the main case (# 03-15297) or Merrill's adversary proceeding (# 03-91486), the citation also refers to the appropriate docket.

[2]    Unless otherwise stated, the citation "(JPTO ¶ __)" refers to the paragraphs in section E, "Undisputed Facts," appearing at pages 7-15, of the Joint Pre-Trial Order.

Merrill, as noted, was the Debtor's secured lender.  (JPTO ¶ 16.)  It had a valid, enforceable, allowed, and duly perfected lien against the Debtor's accounts, chattel paper, contract rights, inventory, equipment, fixtures, general intangibles, deposit accounts, documents, instruments, financial assets and investment property and all proceeds and products thereof.[3] Merrill's claim against the Debtor was fixed and allowed in the amount of $4,634,186.38, as of February 5, 2004, plus certain accrued and accruing post-petition interest and charges and other costs and expenses as provided under Loan Agreements, as allowed under 11 U.S.C. § 506.  (See March 15 Order.)  Since the Trustee's appointment, Merrill has received payment of $3,880,635. As of March 29, 2006, the balance of principal and interest owed to Merrill was $1,016,576. Merrill has also asserted additional claims aggregating approximately $1 million relating to late charges and various collection and litigation expenses.  (Tr. (4/24) 33-41.)

ARC had been a California limited liability company, with its principal place of business in Glendale, California 91203.  ARC is currently incorporated in the State of Delaware and is a public company whose stock is traded on the New York Stock Exchange.  (JPTO ¶ 10.)   It is a leading provider of reprographic services in the United States and also provides reprographic services in Canada.  (JPTO ¶ 11.)  ARC has grown through its acquisition of reprographic companies across the country.  (Tr. (4/25) 129.)  Kumarakulasingam Suriyakumar ("Suri") is the President and Chief Operating Officer of ARC.  (Tr. (4/25) 128.)  Mark Legg ("Legg") is the

---

[3]      See Order, Pursuant to 11 U.S.C. §§ 105, 361, 363, 506 and 510, and Bankruptcy Rules 3012, 4001 and 9019, Approving an Agreement between Trustee and Merrill Lynch Business Financial Services, Inc. ("MLBFS") (I) Authorizing Trustee to Use Cash Collateral To Pay Certain Chapter 7 Administrative Fees and Expenses, (II) Granting MLBFS a Replacement Lien, and (III) Subordinating MLBFS's Lien to Certain Allowed Administrative Expenses, dated Mar. 15, 2004 (ECF Doc. # 158/Case no. 03-15297) (the "March 15 Order"), incorporating the definition of "Collateral" contained in Stipulation and [Proposed] Order between Trustee and Merrill Lynch Business Financial Services, Inc. ("MLBFS"), (I) Authorizing Trustee to Use Cash Collateral To Pay Certain Chapter 7 Administrative Fees and Expenses, (II) Granting MLBFS a Replacement Lien, and (III) Subordinating MLBFS'S Lien to Certain Allowed Administrative Claims, dated Feb. 6, 2004 (ECF Doc. # 150, Ex. A/Case no. 03-15297).

Chief Financial Officer of ARC, and has served in that position for the past eight years.  (Tr. (4/25) 4-5.)

BPI is a wholly owned subsidiary of ARC.  (JPTO ¶ 12.)  BPI provides reprographics services in the greater New York metropolitan area, and was a direct competitor of the Debtor in the reprographics business.  (JPTO ¶ 14.)  BPI's headquarters are located at 853 Broadway in New York City.  (JPTO ¶13.)  Samuel Wexler ("Wexler") is the president of BPI.  (Tr. (4/4) 74-75.)

**B.      The Events Leading to the Management Agreement**

By late 2002, Wiener was close to 80 years of age, and slowing down.  Around this time, he had a chance encounter with Wexler, BPI's president.  Wexler told Wiener that BPI had been sold to ARC, and Wiener said he wanted to call Wexler to discuss it.  (See Tr. (4/4) 104.) Wexler passed the information on to ARC's chief executive officer, who expressed interest in the prospect of acquiring the Debtor.  (See Tr. (4/4) 105-06.)

In or about February 2003, ARC and the Debtor first began negotiations concerning a sale of the Debtor's business to ARC.  (JPTO ¶ 22.)  Springwell Corporation, a private financial advisory firm, through its principal Roger Vincent, represented the Debtor and Wiener in the negotiations.  (See JPTO ¶ 21; Tr. (4/26) 4-5.)  Following ARC's preliminary investigation, the Debtor and ARC entered into a non-binding letter of intent, dated March 19, 2003  (the "LOI"), (PX 2), involving the sale of the Debtor's assets for $9.5 million.  (JPTO ¶¶ 23, 24.)  ARC valued the Debtor for its New York customer base and its good reputation in the reprographics industry in general.  (Tr. (4/26) 32-33.)  All of the Debtor's customer information was shared with ARC pursuant to a confidentiality agreement.  (DX AP.)

6

The transaction was tentatively scheduled to close on April 30, 2003, (JPTO ¶ 24), but never did. (Id. ¶ 33.) There were two main reasons. First, the Debtor was insolvent and in serious financial difficulty well before ARC signed the LOI, (JPTO ¶ 29), and could not meet its financial obligations. (See Management Agreement, dated May 15, 2003, RECITALS ¶ C.)[4] Second, the Debtor had lost key personnel. (Id.) In April 2003, two of the senior managers went to National Reprographics, a major competitor; another did so after his employment agreement expired. (JPTO ¶ 28.) The Debtor did not have noncompete or nondisclosure agreements with any of its key management personnel after the expiration of their employment agreements. (JPTO ¶ 27.)

## C. The Management Agreement

### 1. Introduction

After the LOI failed to close, the Debtor and ARC entered into the Management Agreement on or about May 15, 2003.[5] (JPTO ¶ 34; PX 3.) The Management Agreement placed ARC in control of the Debtor's business and its business information. It included the following provisions:

> a. ARC would act as the general manager of the Debtor "with power to operate and control all aspects of the Business, including pricing, products, services and customers, with the employees of Frey and any employees or agents of ARC as ARC in its sole discretion may determine." (Management Agreement § 2(a); accord JPTO ¶ 44.)

> b. ARC "will operate the Business in a reasonable manner and in what ARC reasonably believes to be in the best interest of Frey." (Management Agreement § 2(a).)

---

[4]    The Management Agreement is located at Tab 1 of PX 3, and will be cited hereinafter as the "Management Agreement."

[5]    The Management Agreement was governed by New York law. (JPTO ¶ 34; Management Agreement § 21.)

   c. ARC could require the Debtor to file a chapter 11 petition, and in that event, both parties would use their efforts to seek an order assuming the Management Agreement.  (Id. § 2(b).)

The Management Agreement included two provisions that exonerated ARC from certain claims arising from competition with the Debtor.  First, the Debtor acknowledged that the ARC Group could continue to compete with the Debtor in the reprographics business, and declared that "such competition [would not] constitute a breach under this Agreement or an act of unfair competition or a breach of any fiduciary duty by ARC," provided that during the term of the Management Agreement, "the ARC Group will not use confidential information about Frey's business or customers obtained by reason of ARC's retention as manager by Frey under this Agreement to compete with Frey for particular customer engagements."  (Management Agreement § 2(c)(iii).)  Second, the Management Agreement provided, with certain exceptions that are not relevant, that "nothing in this Agreement or in the relationship of the parties or as a result of information learned by ARC while performing its duties hereunder shall be deemed to prohibit ARC from soliciting customers served by Frey after the termination of this Agreement or to give rise to a claim of unfair competition or a breach of any fiduciary duty by ARC."  (Id. § 11(e).)

ARC could terminate the Management Agreement on five days notice in the event of a breach.  (Id. § 11(c).)  All notices required under the Management Agreement had to be served upon the Debtor at its 902 Broadway location with a copy provided to its counsel, Ronald Itzler, Esq.  (Id. § 18.)  Finally, if any litigation was instituted to interpret or enforce the Management Agreement, "or with respect to any dispute relating to this agreement," the prevailing party was entitled to recover its reasonable legal fees, expert fees and costs and expenses.  (Id. § 13.)

The parties simultaneously signed three related agreements that warrant mention. The Debtor and Wiener entered into an Employment Agreement pursuant to which the Debtor agreed to employ Wiener until June 30, 2006, unless terminated sooner. (PX 3, Tab 7, § 2.) ARC and Wiener agreed, in a separate Employment Agreement, that ARC would employ Wiener until June 30, 2006, effective, <u>inter alia</u>, upon the termination of his employment with the Debtor. (<u>Id.</u>, Tab 8, § 2.) ARC also agreed to indemnify Wiener, or pay on his behalf, up to $500,000 in connection with his personal guaranty of the Merrill Loan. (<u>Id.</u> § 8.) Lastly, Wiener granted ARC the exclusive right to purchase his shares in the Debtor. (PX 3, Tab 9.) The option price was $1.5 million, (<u>id.</u> § 2(f)), but ARC was entitled to a credit in the amount of any base commissions paid to Wiener under his Employment Agreement with the Debtor, or paid by ARC to or on behalf of Wiener in connection with his guaranty.[6] (<u>Id.</u> § 2(f)(i)-(ii).)

### 2.   ARC's Management of the Debtor

ARC assigned the management responsibilities to its New York-based subsidiary, BPI. Wexler, BPI's president, sent BPI personnel to the Debtor, including accounting and sales personnel. (Tr. (4/4) 78-79; Tr. (4/3 PM) 117-20.) Wexler also met with many of the Debtor's customers to inform them directly of ARC's role as manager of the Debtor and of ARC's intention to acquire the company. (Tr. (4/4) 76-77; <u>see</u> JPTO ¶ 42.)

ARC assigned Legg, ARC's CFO, to manage the Debtor's back office functions, including anything related to the accounting and financing functions of the Debtor. (Tr. (4/25) 13.) Legg was physically present at the Debtor's 902 Broadway location approximately every other week and would stay in New York one to four days depending on the trip. (Tr. (4/25) 13-

---

[6]      Suri, ARC's president, anticipated that as a result of these adjustments, the eventual option price would be next to nothing. (Tr. (4/25) 187-189.)

14.)  The Debtor's financial people reported directly to Legg, (see Tr. (4/25) 14), and he
controlled all payments made by the Debtor.  (Tr. (4/25) 81-82.)

In August 2003, Wexler sent BPI employee Shawn McMenamey to work at 902
Broadway.  He was expected to eventually become President of the Debtor.  (JPTO ¶ 43.)
McMenamey reported directly to Wexler, and was charged with overseeing the operations of the
Debtor.  (Tr. (4/4) 78, 179-80.)  McMenamey reviewed the Debtor's customer files, and called
the Debtor's existing clients to introduce himself. [7]  (Tr. (4/4) 182.)

During the time that ARC operated the Debtor's business, the Debtor's financial
condition continued to decline.  (JPTO ¶ 45.)  On August 22, 2003, the Kinsella Group, a
management consultant selected by ARC at the request of Merrill, delivered its report (the
"Kinsella Report").  (DX AW.)  The Kinsella Report estimated the liquidation value of the
Debtor's assets at $5,074,000, inclusive of approximately $3,600,000 in accounts receivable.  At
that point, the Debtor owed Merrill $4,584,753, and Merrill appeared to be oversecured.  (PX
112, at 3; DX AW, at 2-7.)

The Kinsella Report concluded with a prescient observation that, events showed, the
defendants took to heart:

> It appears that at this point ARC could easily accede to the business of LFC [the
> Debtor] carried on in the Manhattan locations by hiring selected employees of the
> Company.  The $12 million (approx.) in annual business carried on at customer
> locations under facility management arrangements might also be available to
> ARC as a result of a simple sales communication to those customers.

(PX 70, at ML01953.)

---

[7]      Immediately following the execution of the Management Agreement, the defendants placed BPI employee
Peter Deveroux on the Debtor's payroll and assigned to him the Rockwell and Gensler customer accounts.
Rockwell and Gensler became BPI customers in or about September 2003 and currently generate monthly sales for
BPI of about $50,000.00 and $150,000, respectively.  (JPTO ¶ 41.)

### 3.    The Chapter 11 Case

On August 22, 2003 (the "Petition Date"), the Debtor filed its chapter 11 petition in this

Court.  (JPTO ¶ 48.)  Suri personally made the decision to file.  (Tr. (4/25) 191.)  On the Petition

Date, the Debtor filed an emergency application for use of cash collateral without a stipulated

budget or Merrill's consent.  Merrill objected, and the Court initially denied the Debtor's motion.

The parties – the Debtor, Merrill and ARC – thereafter consented to an order approving the use

of its cash collateral, which the Court approved on September 2, 2003 (the "September 2

Order").  (DX AI.)  The budget annexed to the September 2 Order provided for the payment of

ARC's weekly $20,000 management fee.  The September 2 Order was extended by a further

order dated, September 17, 2003,  (PX 102), and the accompanying budget also provided for the

payment of the weekly management fee through and including the week of September 22, 2003.

The last extension was signed on September 25, 2003, and covered the two-week period

beginning September 26, 2003.  (DX AT.)  The budget annexed to this last extension did not

include any money for ARC's management fee.

On August 28, 2003, ARC prepared a proposed turnaround plan for the Debtor.  (See DX

AM.)  The core of the plan involved the physical combination of the Debtor's operations with

those of BPI, although the entities would remain legally separate and distinct.  The Debtor would

move out of its present space at 902 Broadway, and into available space provided for it at BPI's

headquarters.  The Debtor would "outsource" its back office and administrative functions to BPI.

McMenamey, BPI's man on the scene, would become president of the "Louis Frey division,"

and John Moran, one of the Debtor's managers, would become "divisional VP."

Only one day later, however, ARC sent a notice of default (the "Notice of Default"),  (PX

30), to the Debtor and its counsel pursuant to § 11(c) of the Management Agreement.  The notice

stated that the Debtor was in default for non-payment of compensation under § 5, and unless the default was timely cured, ARC would terminate the Management Agreement in five days. According to Suri, who directed that it be issued, the Notice of Default was prompted by the Court's initial denial of the motion to use cash collateral.  (Tr. (4/25) 194-98.)  Despite the Notice of Default, ARC continued to manage the Debtor and move the Debtor's files and information to BPI, ostensibly in accordance with the turnaround plan.  (See Tr. (4/25) 211-12.)

On September 2, 2003, Wiener terminated his employment with the Debtor, citing two reasons.  The Debtor had failed to pay him commissions and did not provide for any payments to him in the September 2 Order.  (DX AB.)  He immediately went to work for ARC under the employment agreement described above.  (See Tr. (4/25) 114-15, 183.)

### 4.      The Termination of the Management Agreement

By letter, dated September 12, 2003 (the "Termination Letter"), (PX 29), ARC terminated its management of the Debtor pursuant to § 11(c) of the Management Agreement. ARC faxed the letter to the Debtor's offices, but to no one in particular, at 902 Broadway on September 15, 2003.[8]  (See PX 29.)  BPI was managing the Debtor, and it is not clear that any manager-employee of the Debtor actually saw the Termination Letter.  Legg testified that he had intended it for Pat Kubinski, the former comptroller and current consultant to the Debtor.  (Tr. (4/25) 94.)  Kubinski already had a job offer from BPI, (Tr. (4/3 PM) 134-36; (Tr. 4/4) 6-7), where she began working on or about October 1, 2003.  (Tr. (4/3 PM) 133.)  Oddly, ARC never bothered to send a copy of the Termination Letter to the Debtor's counsel, as required under the

---

[8]      The Management Agreement did not identify any specific individual at the Debtor to whom the notice should have been directed.

notice provisions of the Management Agreement.  (See Deposition of Ronald Itzler, held Nov.

16, 2004, at 147-48, 186)("Itzler Dep.").

The unpublicized termination did not change the way the parties operated.  ARC and BPI

continued to control the Debtor's day-to-day activities, although it lacked any contractual or

other legal basis.  (See Tr. (4/25) 88, 97; Tr. (4/4) 183-84.)  Wexler was aware of both the Notice

of Default, (Tr. (4/4) 136-37), and the Termination Letter, (Tr. (4/4) 137-38), but continued his

supervisory activities under the Management Agreement on behalf of ARC.  (Tr. (4/4) Tr. 138-

41.)

More importantly, the Termination Letter did not stop BPI from continuing to take for its

own use the Debtor's confidential customer and business information.  On or around September

12, 2003, after the date the Termination Letter was prepared but before it was sent, Jonathan

Kearns, BPI's comptroller, sent Dennis Quirk, the Debtor's Assistant Vice President of Financial

Operations, a "to do" list entitled 2003.09.12 - Louis Frey .BPI Conversion Customer

Conversion Schedule - Rev1.0.  The list included tasks relating to the conversion of the Debtor's

customer master file and customer pricing list to BPI's MV accounting system.  (PX 11; Tr. (4/4)

51-53.)  As requested, Quirk reformatted the Debtor's customer information into a file for import

into BPI's MV accounting system and emailed the information to BPI.  (Tr. (4/4) 55-56; PX 12.)

On September 17, 2003, after the Termination Letter was sent, Quirk created a

spreadsheet for ARC and BPI entitled Frey Customer List for ARC (09-09-03) CLEAN as of 09-

17-03 to be uploaded in to BPI's MV accounting system.  (Tr. (4/4) 39-42; PX 12, 17.)  The

spreadsheet contained the Debtor's customer information (including names, account numbers,

contact information and the salespersons assigned to each account) and was e-mailed to Kearns.

(Tr. (4/4) 45-47, 55-56.)  Around the same time, and again at Kearns' request, Quirk reformatted various files from the Louis Frey accounting system to be streamlined into BPI's MV accounting system.  (Tr. (4/4) 42-44.)

The physical relocation of the Debtor's operations, contemplated under the turnaround plan, also continued post-termination.  In or about September 2003, and as part of the pre-termination consolidation plan, the defendants moved the Debtor's main telephone line to BPI's offices in New York and performed the Debtor's commercial shop work at BPI's facilities in New York City.  (JPTO ¶ 55; Tr. (4/4) 12.)  The Debtor's receptionist was transferred out of 902 Broadway to BPI's 16th Street location on or around September 15, 2003 but was still on the Debtor's payroll.  (JPTO ¶ 57.)  During late August to September 2003, the Debtor's production machinery was moved out of the 902 Broadway location, certain artwork was removed, and numerous boxes with receivable and billing information and client files were delivered to BPI's office in New York.  (Tr. (4/24) 16-17.)  The movement of client files out of the 902 Broadway location to BPI continued through late September.  (Tr. (4/24) 32-33.)

**D.      The September 26, 2003 Shutdown**

By September 26, 2003, a substantial portion of the Debtor's files had already been moved to BPI's facility, (Tr. (4/3 PM) 142-44; Tr. (4/4) 14-19), ARC had terminated the Debtor's commercial shop operations at the Debtor's 902 Broadway headquarters, and ARC had transferred the work and some of the Debtor's former employees to BPI.  (JPTO ¶ 55; Tr. (4/3 PM) 151-53).

Having accomplished the "turnaround" plan, ARC shut down the Debtor on September 26, 2003 (the "Shutdown Day") without any advance warning.  By this time, Wiener was an

ARC employee, (Tr. (4/25) 214), and the senior employee of the Debtor was John Moran.  (See

Tr. (4/4) 143, 148.)  Moran testified that he was surprised by the news that the Debtor was to be

shut down that day.  (Tr. (4/4) 148-49.)  The Debtor's bankruptcy counsel, Itzler, first learned of

the shut down during a phone call with Kubinski on September 29, 2003.[9] (Itzler Dep., at 145-

46, 162-64; PX 31.)  Itzler immediately wrote to the United States Trustee to notify the office of

the events of the previous Friday.  (Itzler Dep. 165-68; PX 31.)  Merrill also first learned of the

shutdown on September 29, 2003.  (See PX 38.)

Furthermore, ARC made no effort to hand control back to the Debtor; to the contrary,

ARC's actions ensured that the Debtor could never operate again.  The physical equipment and

files had already been moved to BPI's headquarters.  On the Shutdown Day, McMenamey

rejoined BPI, (Tr. (4/4) 79-80), with the title of Executive Vice President.  (Tr. (4/4) 185, 189.)

McMenamey took listings of all the Debtor's accounts in Manhattan back with him to BPI "to

eventually bring the business over to BPI."  (Tr. (4/4) 186.)  McMenamey used the "computer

run" of the Debtor's customers to solicit customers for BPI.  (Tr. (4/4) 209-10.)

On the Shutdown Day, BPI also offered jobs to the Debtor's key employees.  Moran, the

Debtor's vice president and an employee of approximately 27 years, (Tr. (4/4) 143), accepted

BPI's offer.  (Tr. (4/4) 145-46.)  While employed by the Debtor, Moran had primary

responsibility for two customer accounts, Parsons Brinckerhoff and Hennigan Construction.  (Tr.

(4/4) 147.)  On the Shutdown Day, he contacted these customers, told them that he was no longer

employed by the Debtor and asked them to transfer their business to BPI.  (Tr. (4/4) 153.)

---

[9]    Kubinski testified that she advised Itzler of the shutdown on September 26th.  (Tr. (4/3 PM) 124-26.)  The
discrepancy of one day is immaterial; it is clear that ARC never bothered to tell him.

Parsons Brinckerhoff and Hennigan Construction are currently customers of BPI, (Tr. (4/4) 154), and are Moran's primary client responsibility at BPI. (Tr. (4/4) 147.)

Moran met with small groups of employees at the Debtor's premises to inform them of ARC's decision to cease managing the Debtor. (Tr. (4/4) 149; JPTO ¶ 58.) He told the employees he would not be at the Debtor the following Monday, September 29, 2003, and that there would be no one left to manage them. (Tr. (4/4) 150.) Moran also informed certain of the Debtor's employees that jobs at BPI were available to them on the authority of McMenamey. (Tr. (4/4) 150-52; JPTO ¶ 59.) Those employees that were offered jobs at BPI to start the following Monday accepted the offers. (Tr. (4/4) 151.) Moran assumed that those employees who were not offered jobs would go on unemployment or find other jobs. (Tr. (4/4) 9-13.)

On September 26, 2003, Moran fired Quirk, telling him that the Debtor was shutting down and there were no longer jobs at the Debtor for anyone. (Tr. (4/4) 56-57.) A few hours later, however, BPI offered jobs to Quirk and two other Debtor employees, Gary Margolies and Laura Milander. (Tr. (4/4) 57-59.) Quirk's files were delivered to BPI the week of September 29, 2003. (Tr. (4/4) 59-61.) Quirk also brought his laptop, containing the Debtor's customer and pricing files when he started his new position at BPI the next business day. (Tr. (4/4) 61-62.)

Not surprisingly, Quirk continued to be a valuable source of information regarding the Debtor's business and customers. For example, on October 2, 2003, BPI employee Anna Rodriguez e-mailed Quirk and Jonathan Kearns asking for information relating to the Debtor's customer accounts and pricing. Quirk gave her the Debtor's information. (Tr. (4/4) 65-66; PX

16

52.)  On October 8, 2003, Rodriguez e-mailed Quirk and Michael Franks,[10] the Debtor's former

collection manager and new BPI employee, regarding the ongoing upload of the Debtor's pricing

information to BPI's MV accounting system.  She asked for information relating to the Debtor's

customer accounts and pricing.  Quirk answered her questions.  (Tr. (4/4) 66-67; PX 53.)

George Gooding, the Debtor's former assistant comptroller, reported to BPI on

September 29, 2003.  (Tr. (4/4) 154-55.)  He was fired four days later, (Tr. (4/24) 20-21), but not

before he was directed to enter the Debtor's client lists and accounts into the BPI accounting

system by hand.  (Tr. (4/24) 19-20.)

Like McMenamey, Wexler wasted no time closing in on the Debtor's customers.  On the

Shutdown Day, he contacted several for the express purpose of soliciting their business for BPI.

(Tr. (4/4) 87-89.)  Wexler also directed BPI personnel to contact the various managers of the

Debtor's FM locations to instruct them to continue working as normal.  ARC hired the Debtor's

on-site FM managers and continued to service the Debtor's former customers, now BPI

customers, (Tr. (4/25) 215-16), billing them and collecting revenue for its own benefit.  (Tr.

(4/25) 216-17.)

As a result of the Shutdown, the Debtor could not carry on its business, and lost its

remaining customers.  It was not initially apparent at trial why BPI remained in control after

ARC terminated the Management Agreement, or why ARC pulled the plug on the Debtor when

it did.  At trial, ARC attributed its actions to its own noble motives.  Legg testified that despite

---

[10]     Franks had already boxed up his files and delivered them to BPI's offices.  (Legg Dep. 148.)  The
Debtor's other employees who joined BPI also took files and information pertaining to the Debtor's customers to
BPI.  (Tr. (4/25) 100.)

the issuance of the Termination Letter on September 12, 2003, ARC continued to manage the Debtor because, among other things, had ARC simply left on September 12, 2003, the Debtor would have immediately deteriorated because "[the Debtor] had no management in place.  Their top managers had all left."  (Tr. (4/25) 37-38.)  Legg further testified, "We were managing the company.  If we left, that's correct.  There would be no management at the company."  (Tr. (4/25) 77.)

Of course, that was as true on September 26th as it was on September 12th.  Moreover, the Debtor, though ailing, was still an operating business.  If ARC simply left, the Debtor could have hired another manager, as the Trustee eventually did.  Rather, BPI hung around after the Termination Letter and left on September 26th for selfish entirely selfish motives, as the defendants' own witness eventually acknowledged.

## E.    ARC's Motives

As noted, ARC had no contractual right to continue to manage the Debtor after the Termination Letter.  It remained in charge, and through BPI, continued to upload customer information, in the hope of signing an agreement with Merrill to collect the accounts receivable. (See Tr. (4/25) 100-01.)  Around the time of the Termination Letter, Legg had entered into negotiations with Mark Crady, the Merrill officer in charge of the Loan, about helping Merrill collect Merrill's debt form the Debtor (the "Collection Agreement").  (Tr. (4/25) 38-39.)  Early on, Crady and Legg agreed on ARC's commission rate, and Legg recognized that to earn its commissions, it needed to use the Debtor's contact list, customer list and pricing files.  (Id. 40.) The parties kept talking, and ARC continued to upload the Debtor's business information and move the Debtor's collection documents to BPI to facilitate its anticipated new role.  (See Tr. (4/25) 101.)

A final deal never materialized.  On September 25, 2003, Crady told Legg that Merrill
would not sign the Collection Agreement.  (Tr. (4/25) 43-44, 84.)  Crady also informed Legg that
Merrill would not consent to the use of cash collateral after the week of September 29th, although
Legg convinced Crady to extend the deadline by one week.  (Tr. (4/25) 42-43.)  Legg expressed
his disappointment, and told Crady:

> There is no point in us going on.  <u>We're not the managers of Louis Frey anymore</u>.
> You've told me that you're not going to pay me and there's not going to be any
> more collection agreement that we had to leave.  There was nothing left for us to
> do.

(Tr. (4/25) 44-45) (emphasis added.)

ARC shut the Debtor down the next day.  It still, however, had some personal concerns.
ARC feared abandoning the Debtor's customers because ARC affiliates served the same
customers in other cities, these customers knew that ARC was managing the Debtor, and
abandonment would have tarnished ARC's reputation with those customers and in the industry
as a whole.  (See Tr. (4/25) 76.)   According to Legg, the uploading of the Debtor's customer
information continued even after the proposed Collection Agreement was rejected (1) to preserve
the value of Merrill's collateral, (2) to prevent "tremendous" damage to ARC resulting from the
abandonment of the very customers it did business with across the country, and (3) because "we
knew sooner or later someone else was going to be in there and we were still hoping to do a deal
at some point."  (Tr. (4/25) 102-03.)

As a result of the Shutdown, the Debtor went into a free fall, and Merrill stepped into the
breach to protect its collateral.  Pursuant to an Order to Show Cause, dated Oct. 2, 2003, the
Court granted a temporary restraining order that authorized Merrill to act on behalf of the Debtor
to, among other things, invoice the Debtor's customers for unbilled services, communicate with

the Debtor's customers regarding unpaid bills, and take commercially reasonable steps to liquidate the Debtor's accounts receivable.  (Order to Show Cause (I) Shortening Notice, (II) Fixing A Date and Time to Consider Stipulation and Order Vacating Automatic Stay Pursuant to 11 U.S.C. § 362(f) of the Bankruptcy Code, and (III) Authorizing Interim Relief Pending Approval of the Stipulation, dated Oct. 2, 2003 (ECF Doc. # 41/Case # 03-15297).)

On October 10, 2003, Merrill commenced its adversary proceeding against the defendants, and simultaneously sought a temporary restraining order, which the Court signed the same day (the "October 10 Order").  (See Order to Show Cause (I) Shortening Notice, (II) Fixing A Date and Time to Consider Request For Preliminary Injunction; and (III) Temporarily Restraining Defendants with Respect to Certain Estate Property, dated Oct. 10, 2003 (ECF Doc. # 2/Adv. Proc. # 03-91486).)  The TRO restrained ARC and BPI from exercising dominion and control over property of the Estate, using the Debtor's trade names or trademarks, purporting to act on behalf of the Debtor, using the telephone or facsimile communications of the Debtor, or using any equipment leased or owned by the Debtor at any location.  The October 10 Order also directed the defendants to make available for turnover any property of the Estate in their possession custody or control, including the Debtor's books and records, customer lists, leases and contracts.

## F.    The Conversion to Chapter 7

By order dated October 16, 2003 (the "Conversion Date"), the Court converted the Debtor's case to chapter 7, and the United States Trustee appointed Yann Geron as Trustee.  The Trustee commenced a frantic action to preserve what might be left of the Debtor's business, or at least, to minimize the claims against the Estate.  By this time, equipment lessors were demanding the return of the leased reprographic equipment located at the various FM locations.  In addition,

the Trustee was concerned about the Estate's and his potential liability regarding the personnel that continued to man the FM facilities. (Tr. (4/3 AM) 112-13.)

According to the Trustee's testimony, which I found to be credible, ARC continued to hold out the prospect that it would pay the Estate for its customers.   On October 17, 2003, the Trustee met with Legg, ARC's counsel in New York, and a lawyer representing Merrill Lynch. (Tr. (4/3 AM) 108-09.)  At the meeting, Legg expressed ARC's desire to purchase the Debtor's assets.  (Tr. (4/3 AM) 109-10.)  He also told the Trustee that ARC was interested in purchasing the Debtor's business as a whole pursuant to a sale under § 363 of the Bankruptcy Code; the Estate would retain the accounts receivable.  (Tr. (4/3 AM) 110-12.)  Legg further expressly assured the Trustee that ARC was willing to pay well north of $3 million for the Debtor's business.  (Tr. (4/3 AM) 112.)

The Trustee responded that he needed to move quickly on the sale of the Debtor's business, and he expected to receive a formal offer to purchase from ARC's New York counsel, Esanu Katsky.  (Tr. (4/3 AM) 113-14.)  When he made specific inquiries concerning the status and location of Louis Frey's FM operations, Legg simply assured the Trustee that those issues would be subsumed by the intended asset purchase and that the data would eventually be transmitted to the Trustee in the form of reports, which in fact were never delivered.  (Tr.  (4/3 AM) 114-15.)

The October 10 Order and TRO procured by Merrill presented a problem for ARC.  ARC informed the Trustee that before any asset purchase agreement could be consummated, ARC required a "Use Agreement" under which ARC would receive retroactive authorization to use the Debtor's equipment to continue, among other things, to service the customers at the various FM

locations.  ARC was concerned about the possible effect of the October 10th injunction, and insisted on an agreement that allowed it to continue servicing the Debtor's customers.  The Trustee, in turn, desired an arrangement that would facilitate the expeditious sale of the business by providing a continuity of service to the customers.  (Tr. (4/3 AM) 115-17.)  ARC continued to represent to the Trustee that it intended to enter into an asset purchase agreement with the Trustee for the purchase of the Debtor's business.  (Tr. (4/3 AM) 117-18.)

The negotiation of the "Use Agreement" (DX. BI) was near completion by the end of October.  On October 30, 2003, the Trustee had spent hours on the phone with ARC's counsel, and worked on drafts that the Trustee believed incorporated the final changes.  The Trustee had adopted all of ARC's changes, and sent a last draft to ARC's counsel late that evening indicating that the agreement had to be signed the following day.  (Tr. (4/3 AM) 122.)

The negotiations came to a head on October 31, 2003.  ARC insisted on two entirely new changes, one of which was extremely problematic.  ARC conditioned the proposed Use Agreement on the entry of an order lifting Merrill's injunction and a waiver by Merrill of any claim it had against ARC arising on or after October 1, 2003.  (See Tr. (4/3 AM) 123-24.) Merrill had not participated in the negotiations, and ARC's new proposal required Merrill's affirmative consent.  This necessitated reopening the negotiations.  (Tr. (4/3 AM) 124.) Moreover, the Trustee knew that it was unacceptable to Merrill.  (Tr. (4/3 PM) 106-07.)

The Trustee, understandably annoyed, immediately contacted ARC's counsel, informed him that the change was not acceptable, and insisted that the proposed Use Agreement had to be signed and delivered to the Trustee that day, to be held in escrow if necessary.  (Tr. (4/3 AM)

125-26; DX F.)  ARC's counsel submitted another proposed Use Agreement later that same day, (see DX BI), but the new draft still required waivers from Merrill.  (See Tr. (4/3 PM) 104-05.)

Concluding that he would not come to an agreement with ARC, the Trustee searched for an alternative manager.  After National Reprographics refused, (see Tr. (4/3 AM) 128-31), the Trustee contacted counsel to Bruce Wiener ("Bruce"), Seymour Wiener's son and a former employee of the Debtor, to inquire about his ability and desire to act immediately to take over the management of the Debtor.  (Tr. (4/3 PM) 5-6.)  The Trustee had certain concerns about Bruce's capacity to manage the business, (Tr. (4/3 PM) 7-8), but after he and Merrill's counsel met with Bruce and his financial backer, the Trustee was satisfied.  (Tr. (4/3 PM) 8-10.)

The Trustee entered into a management agreement with Bruce and his company, BW Reprographics, LLC ("BWR"), on or about November 6, 2003.  (DX J; Tr. (4/3 PM) 10.)  The Court approved the agreement the next day.  (Tr. (4/3 PM) 17.)  By letter dated November 10, 2003, (DX K), the Trustee informed the Debtor's customers of the Estate's arrangement with BWR, and that all questions or concerns could be directed to BWR.   (Tr. (4/3 PM) 17.)

Almost immediately after the November 10th letter was transmitted, the Trustee received notices from six to twelve customers terminating the Debtor and demanding the removal of all the Debtor's equipment.  (Tr. (4/3 PM) 17-18; PX 56-65.)   Wexler, BPI's president, assisted some of the Debtor's customers in preparing their termination letters.  (Tr. (4/4) 96; JPTO ¶ 65.)  In response to the termination letters, the Trustee contacted ARC's counsel by email, (DX L), and told him that there was a significant problem with the customer base and that the Estate and ARC had to address the competing concerns of the Estate, the lessors, the customers and the service provider.  The Trustee also conveyed to counsel that these interests, that were to have

23

been resolved through a sale of the business as a whole, now had to be dealt with on a customer-by-customer basis.  (Tr. (4/3 PM) 20-21.)

On or about November 12, 2003, the Trustee spoke with Suri and ARC's counsel by telephone.  (Tr. (4/3 PM) 21-22.)  They discussed an arrangement (the "Interim Agreements") by which (1) ARC could continue to service the customers for its own benefit with the Debtor's equipment on a customer-by-customer basis, (2) ARC would compensate the Estate for the use of equipment, and (3) the Estate would eventually "sell" that relationship to ARC.  Each Interim Agreement stated:

> In reliance on this interim agreement, the Trustee and ARC will work together promptly and in cooperation to reach a Final Transition Agreement including a "sale" to ARC, as the designated service provider of whatever assets may be related to [name of customer]. That agreement will be separately stated.

(PX 99; Tr. (4/3 PM) 24-26.)

ARC and the Trustee subsequently entered into several Interim Agreements.  The Court approved them, and ARC paid the Estate the compensation due under each agreement for the use of the Debtor's equipment.  (Tr. (4/3 PM) 27.)  With each Interim Agreement, the Trustee demanded a proposal for purchasing the customer relationship.  ARC assured him that it was forthcoming, but none ever materialized.  (Tr. (4/3 PM) 27-28.)

In the meantime, the Trustee surmised that there was some confusion and concern on the part of the customers surrounding their ability to continue to receive reprographic services.  (See Tr. (4/3 PM) 29.)  As a result, the Trustee wrote to the customers on December 1, 2003, (DX O), to allay their concerns.  (Tr. (4/3 PM) 30.)  The letter sought to reassure the customers that they would not suffer a disruption in services; the Estate would continue to provide reprographic services through BWR until another company took over the account.  The letter also stated that

"BWR is the <u>only</u> entity formally authorized by me to service customer accounts."  (DX O)(emphasis in original.)

The December 1st letter evoked a reaction from ARC who was servicing some of the former customers as its own under the Interim Agreements.  (<u>See</u> Tr. (4/3 PM) 30.)  At ARC's insistence, the Trustee sent letters on December 5th, (DX AX), to the former customers that had opted to use BPI.  ARC approved the form of the letter, (Tr. (4/3 PM) 30-31), which assured these customers that the earlier letter was not intended to disturb their choice of BPI.  The December 5th letter explained the nature of the interim arrangement between the Estate and ARC, and concluded:

> ARC and I have intentionally given these temporary arrangements short terms because ARC and I are in the process of negotiating an agreement on the final transition of your accounts to ARC, which will address your concerns . . .. We hope and expect to have those agreements finalized by the time these interim agreements expire within the next two weeks.

The Trustee's hopes and expectations were finally dashed one week later.  On Friday, December 12, 2003, ARC informed the Trustee that it was not interested in purchasing the customer relationships under the Interim Agreements.  Moreover, it gave the Trustee until December 15, 2003, the following Monday, to remove all of its equipment from 20 of the clients' facilities.  (Tr. (4/3 PM) 31-32.)  The Trustee was able to coordinate the removal of the Debtor's equipment from each of the customer locations and ultimately conducted a rolling auction of the equipment from the 902 Broadway location.  (Tr. (4/3 PM) 32-34.)

In the end, many of the Debtor's former customers became customers of ARC/BPI.  The following chart reflects their identity, and the amount of net sales that BPI invoiced to them for the one-year period beginning November 1, 2003 and ending October 31, 2004:

| Customer | Net Sales |
|---|---:|
| Gensler | 1,800,000 |
| Parsons Brinckerhoff | 1,638,000 |
| Rockwell Group | 841,000 |
| Mancini Duffy | 572,000 |
| Henegan | 332,000 |
| Wank Adams | 86,000 |
| Conant | 54,000 |
| Manhattan Mall | 50,000 |
| Orsini | 32,000 |
| RAMSA | 115,000 |
| Columbus Southern Power/AEP | 70,000 |
| Forest City | 58,000 |
| Lehr Construction | 45,000 |
| Flack & Kurtz | 39,000 |
| Highland | 36,000 |
| | **5,768,000** |

(JPTO ¶¶ 72-73.)

**G.    This Litigation**

**1.    The Pleadings**

As noted, Merrill commenced its adversary proceeding on October 10, 2003.  Merrill's

Second Amended Complaint, (ECF Doc. # 26/Adv. Proc. # 03-91486), contained four causes of

action.  The first three were derivative of the Estate's injuries.  Merrill charged that the

defendants willfully and maliciously converted its collateral, tortiously interfered with the

contractual relations between the Debtor and its customers, thereby impairing its collateral, and

were unjustly enriched.  The Fourth Claim alleged that Merrill was a third party beneficiary of

the Management Agreement, and sought damages for its breach.

The Trustee subsequently filed his own, multi-count complaint against the defendants.

His Amended Complaint, (ECF Doc. # 4), sought to recover money and other damages

stemming from the defendants' breach of their fiduciary duties, unjust enrichment, breach of

contract, violations of the Lanham Act, misappropriation of trade secrets, common law fraud and

misrepresentation, and unauthorized post-petition transfers in violation of 11 U.S.C. §§ 549(a)

and 550.[11]  In addition, the Trustee sought to disallow the defendants' proofs of claim.

The defendants denied the material allegations in each complaint, and ARC asserted

counterclaims against both plaintiffs.  ARC contends that Merrill induced it to perform services

for the Debtor, ARC performed the services (or incurred expenses) at Merrill's behest but was

not compensated, Merrill benefited from ARC's services, and ARC is, therefore, entitled to

recover from Merrill in quasi-contract based upon principles of unjust enrichment.  ARC also

asserted three counterclaims against the Trustee sounding in fraudulent misrepresentation,

defamation, and tortious interference with business relations.  ARC subsequently withdrew the

fraud and tortious interference claims.  (Defendants' Post-Trial Memorandum In Lieu of

Requests for Conclusions of Law, dated May 24, 2006, ("Defendants' Memorandum"), at 30)

(ECF Doc. # 65.)  ARC also sought indemnity and contribution from Merrill, or damages, based

---

[11]     The parties settled the preference and fraudulent conveyance claims brought by the Trustee pursuant to 11
U.S.C. §§ 547, 548 and 550 and New York Debtor & Creditor Law §§ 272-276.  In addition, the Trustee withdrew
his claims for conversion and intentional interference with contractual relations.

on theories of agency and conspiracy, and joined Merrill as a counterclaim defendant.  (ECF

Doc. # 6.)

### 2.      Motion Practice

In November 2004, Merrill moved to dismiss the counterclaims, to the extent they were

asserted against Merrill by the defendants, in the Trustee's adversary proceeding.  In a

Memorandum Decision dated Mar. 1, 2005, the Court granted Merrill's motion, and dismissed

the Fourth Counterclaim.  (ECF Doc. # 21.)  The defendants moved for reargument, (ECF Doc. #

22), and by Order dated May 11, 2005, the Court denied the motion for reargument, and

dismissed the Fourth Counterclaim with prejudice.  (ECF Doc. # 26.)

The defendants thereafter moved, in the alternative, to dismiss Merrill's Second

Amended Complaint, or for partial summary judgment.  The defendants contended that Merrill

lacked standing to assert the first three claims, and was not a third party beneficiary as alleged in

the fourth.  (ECF Doc. ## 29, 31.)  The Court heard the motion on September 7, 2005, and

requested additional briefing regarding a secured party's standing under non-bankruptcy law to

sue for damage to its collateral.  (ECF Doc. # 278, at 6-10/Case # 03-15297.)  By order dated

December 16, 2005, the Court denied the motion with respect to the first and second claims

relating to the damage to Merrill's collateral and its third party beneficiary contract claim, and

reserved decision on Merrill's claim for unjust enrichment.  (ECF Doc. # 53/Adv. Proc. # 03-

91486.)

In the interim, the Trustee and Merrill entered into a joint litigation agreement, (ECF

Doc. # 57, Ex. A), that streamlined the litigation and solved some of the practical problems

raised by Merrill's pursuit of claims charging injury to its collateral.  All recognized that these

claims were essentially the same as (and derivative of) those asserted by the Trustee on behalf of

the Estate.  The Trustee and Merrill agreed to prosecute their claims jointly.  Any recoveries by

either party would be paid to the Trustee and distributed in accordance with the prior orders of

the Court relating to the use of cash collateral and the retention of special counsel.

## DISCUSSION

A.    **The Trustee's Claims**

    1.  **Breach of Fiduciary Duty**

        a.  **Liability**

The Trustee's principal claim is that the defendants, acting jointly, breached their

fiduciary duties to the Debtor.  "Under New York law, a breach of fiduciary duty claim requires

(1) the existence of a fiduciary relationship between the parties and (2) a breach of the duty

flowing from that relationship."  Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423,

459 (S.D.N.Y. 2006).  A fiduciary relationship arises under New York law "when one has

reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting

superiority of influence over the first, or when one assumes control and responsibility over

another."  Reuben H. Donnelly Corp. v. Mark I Mktg. Corp., 893 F. Supp. 285, 289 (S.D.N.Y.

1995); accord Henneberry, 415 F. Supp. 2d at 459; DDCLAB, Ltd. v E.I. DuPont De Nemours

and Co., No. 03 CV 3654(GBD), 2005 WL 425495, at *8 (S.D.N.Y. Feb. 28, 2005); Ross v. FSG

PrivatAir, Inc., No. 03 Civ. 7292(NRB), 2004 WL 1837366, at *5 (S.D.N.Y. Aug. 17, 2004); see

Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs., 388 F. Supp. 2d 292, 305

(S.D.N.Y. 2005) ("a fiduciary relation exists between two persons when one of them is under a

duty to act or to give advice for the benefit of the other upon matters within the scope of the

relation.") (internal quotation marks and citations omitted).  "While a contract might embody a

fiduciary relationship, there is no requirement that a fiduciary relationship be memorialized in writing." Henneberry, 415 F. Supp. 2d at 460; accord Wiener v. Lazard Freres & Co., 672 N.Y.S.2d 8, 14 (N.Y. App. Div. 1998).

There is no dispute that ARC and BPI owed fiduciary duties to the Debtor arising from their management of its operations. Suri understood that ARC and BPI owed the Debtor the duties of loyalty and due care. (Tr. (4/25) 214.) ARC and BPI were in total control of the Debtor's operations, assets and employees, and had access to the Debtor's confidential business information. Furthermore, the fiduciary duties continued beyond the purported termination of the Management Agreement on or about September 15th since the nature of the defendants' control did not change until September 26th.

The defendants breached their fiduciary duties to the Debtor, and the recitation of their breaches forms a remarkable catalogue of wrongdoing. After ARC terminated the Management Agreement, it had no legal right to remain on the premises or continue to manage the Debtor's affairs. The Defendants hung on only because ARC was trying to work a side deal with Merrill to collect the accounts receivable and earn a fee. During this period, BPI uploaded the computer information and obtained paper files relating to the Debtor's business operations, including its financial data and customer pricing lists. The defendants misappropriated this information in expectation of collecting the accounts receivable for Merrill, although the Court had not yet authorized Merrill to collect the debts. It also continued to move the Debtor's phone and fax lines, commercial operations, and employees to BPI's premises.

Once the Collection Agreement fell through, the defendants quit the Debtor's premises, terminated the Debtor's employees, and immediately rehired the employees it needed. ARC was

very concerned that any interruption in service would adversely affect its standing in the
reprographics industry and its relationship with the very same customers that it serviced in other
cities.  ARC's concern was matched by its enormous strategic advantage.  It knew the FM
customers, their needs and the prices that the Debtor had been charging them; it knew the
identities of the Debtor's employees who manned the FM sites; it was well aware of the
customers' fears of any interruption in their service; and it had hired the Debtor's employees,
such as Moran, who had contacts with several of the customers.  The defendants had a head start
over every other reprographics company, and were able to smoothly transfer a substantial portion
of the business to BPI.

Furthermore, after the Shutdown, the Debtor could not continue in business, even with
another manager.  ARC had hired Wiener on September 2nd, and BPI had hired Kubinski and
Moran.  There was no one left to run the Debtor's business; indeed, there was no business left to
run.  The defendants used the new employees and the information that they had misappropriated
during the preceding two weeks to contact the Debtor's former customers and continue serving
there reprographic needs.

In reaching this conclusion, the Court rejects the defendants' argument that the Debtor's
customers were well known, or the suggestion that the defendants obtained these customers by
competing on a level playing field.  McMenamey, the BPI-designated heir apparent to manage
the Debtor and eventual owner of his own reprographics company, testified credibly that he did
not know the identity of all of the Debtor's largest customers until he began working for the
Debtor in connection with the Management Agreement.  (Tr. (4/4) 201.)  He was "surprised
when [he] reviewed [the Debtor's customer list]" and "that [the Debtor] handled them."  (Tr.
(4/4) 201.)  He further testified that the value in reprographics businesses lies in the "clients, the

31

customers, [and] the accounts" that the companies serve, (Tr. (4/4) 188-89), and the identity of

customer lists and pricing information is considered confidential information in the

reprographics business.  (Tr. (4/4) 208.)  Companies in the reprographics industry, for example,

do not freely share customer-pricing information, and BPI itself would expect a competitor to

pay for such information.[12]  (Tr. (4/4) 84-85.)

        The Court also rejects the defendants' argument that the wholesale misappropriation of

the customer information and the customers themselves was permissible under the exoneration

provisions of the Management Agreement.  As noted, § 11(e) of the Management Agreement

stated that "nothing in this Agreement or in the relationship of the parties or as a result of

information learned by ARC <u>while performing its duties hereunder</u> shall be deemed to prohibit

ARC from soliciting customers served by Frey after the termination of this Agreement or to give

rise to a claim of unfair competition or a breach of any fiduciary duty by ARC."  (Emphasis

added.)  In the first place, the Trustee showed clearly and convincingly that the defendants

misappropriated the customer information and integrated that information into BPI's computer

system <u>after</u> ARC terminated the Management Agreement.  Hence, they stole the information

when they were no longer performing their duties under the Management Agreement.

        Moreover, I do not interpret the Management Agreement to mean that the defendants

could store away confidential customer information while managing the Debtor, and then use it

to the detriment of the Debtor after the contractual relationship terminated.  The clause does not

say that ARC can use confidential information to compete; it says that ARC can solicit the

Debtor's customers without facing claims of unfair competition or breach of fiduciary duty.

---

[12]        In fact, BPI requires its sales people to sign non-compete agreements, and departing BPI salespersons are
prohibited from taking customer files and customer pricing schedules.  (Tr. (4/4) 81-84.)

Indeed, it is questionable whether the exoneration clause could be enforced in the manner interpreted by the defendants. Analogy to the law of trust highlights the problem. A trust agreement may not exonerate a trustee for liability in the case of breach of trust, bad faith or intentional or reckless indifference to the interest of the beneficiary. In re Joan & David Halpern Inc., 248 B.R. 43, 45 (Bankr. S.D.N.Y.), aff'd, No. 00 Civ 3601(JSM), 2000 WL 1800690 (S.D.N.Y. Dec. 6, 2000); RESTATEMENT (SECOND) OF TRUSTS § 222 (1959). The defendants' interpretation would allow them to turn their breach of trust and bad faith into a commercial advantage.

In the end, the defendants followed the approach prophesized in the Kinsella Report; they took the Debtor's customers and business without paying for it. I find from the evidence that the defendants, acting jointly, misappropriated the Debtors' customer lists and customer-related information for their own benefit, drove the Debtor out of whatever business was left, and acquired the Debtor's valuable customer relationships for their own benefit to the detriment of the Debtor and its creditors. I now turn to the question of the Estate's recovery.

**b.  Compensatory Damages**

**I.  Introduction**

"An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach – not simply to compensate for damages in the event of breach." ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 995-96 (2d Cir. 1983). "[T]he function of [an action founded on breach of fiduciary duty] . . . is not merely to compensate the plaintiff for wrongs committed by the defendant but . . . 'to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates." Diamond v. Oreamuno, 248

N.E.2d 910, 912 (N.Y.1969) (emphasis in original).  In addition to its consequential damages,

the aggrieved party is entitled to recover the amount of the ill-gotten gains realized as a result of

the breach.  Diamond v. Oreamuno, 248 N.E.2d at 912 ("Just as a trustee has no right to retain

for himself the profits yielded by property placed in his possession but must account to his

beneficiaries, a corporate fiduciary, who is entrusted with potentially valuable information, may

not appropriate that asset for his own use . . .").   The breaching fiduciary must account for his

profits, 1 DAN B. DOBBS, LAW OF REMEDIES: DAMAGES-EQUITY-RESTITUTION § 4.3(5), at 611

(2d ed. 1993) ("DOBBS"), and the measure of recovery is based on principles of restitution.  See

Federal Trade Comm'n v. Verity Int'l, Ltd., 443 F.3d 48, 67 (2d Cir. 2006) ("The appropriate

measure for restitution is the benefit unjustly received by the defendants."); Pereira v. Farace,

413 F.3d 330, 340 (2d Cir. 2005) ("[R]estitution is measured by a defendant's unjust gain, rather

than by a plaintiff's loss.") (internal quotations omitted), cert. denied, 126 S.Ct. 2286 (2006);

## II.    Michael Aronow

**The Primary Component**

Three damage experts testified at trial, and all were qualified without objection.  Michael

A. Aronow, the Trustee's expert,[13] whose report was received as PX 114, concluded that the

Debtor had incurred approximately $10,197,000 in damages, before fees and expenses.  (Tr.

(4/24) 53; PX 114, at 29.)  He divided his damage calculation into two categories.  The Primary

Component consisted of the customers taken and serviced by ARC; Aronow calculated the

Primary Component damages at $9,300,000 (Tr. (4/24) 53-54; PX 114, at 6, 29.)  The Remainder

Component, which consisted of the customers that remained behind but could not be serviced

---

[13]     Aronow is a corporate finance partner at Eisner, LLP, focusing on valuation and due diligence.  (Tr. (4/24) 46; PX 114, Ex. 4.)  He is a CPA, accredited in business valuation by the American Institute of Certified Public Accountants, and is a certified valuation analyst.  Aronow received an MBA in finance from New York University Stern School of Business.  (Tr. (4/24) 48; PX 114, Ex. 4.)

because of ARC's actions, yielded a damage calculation of $897,000.  (Tr. (4/24) 86, 105; PX 114, at 6, 29.)  Because I found Aronow the most credible of the three, and his methodology the most rigorous, I spend some time detailing his analysis.  A more complete exposition may be found in his report.

The damages for the Primary Component were calculated by measuring the benefit to ARC derived from the customers taken from the Debtor.  The benefit to ARC was measured by the increase to ARC's enterprise value, or EV, attributable to the incremental earnings on sales to the Debtor's former customers.  (PX 114, at 7.)  This was a multi-step process.  Aronow started with the net sales attributed to the Debtor's former customers during the year beginning November 1, 2003.  The parties stipulated that 15 customers defected to BPI, and that the net sales invoiced to these customers totaled $5,768,000.  (See JPTO ¶ 73; see also PX 114, at 15.)  Aronow ignored the sales to the six former customers that left ARC during the year, and reduced the net sales to $5,405,000.  (PX 114, at 13-16.)

These net sales did not translate into an equal amount of profit; ARC (or BPI) incurred incremental costs to service the additional business.[14]  The former customers taken by the defendants were FM customers, and Aronow calculated ARC's historic FM profit margin at 28.7%.  (PX 114, at 18; Tr. (4/24) 67-72.)  Aronow then estimated the variable selling, general and administrative costs ("SG&A") attributable to the additional business (9.8%), subtracted that number from the profit margin (28.7%), and computed the incremental EBIT percentage as 18.9%.  (PX 114, at 19-20; Tr. (4/24) 72-77.)  In other words, the $5,405,000 in net sales yielded an incremental EBIT of $1,022,000. (PX 114, at 21.)

---

[14]    Aronow assumed, in this regard, that the net sales reflected gross profit that would require additional reductions to reach a net profit figure.

Every dollar of incremental EBIT increased ARC's enterprise value, or EV, by some amount, and Aronow next calculated this EBIT multiple. At the time, ARC was a privately held limited liability company, and Aronow estimated its EV by calculating the value of its membership units. Aronow used $5.55 per unit, the average weighted exercise price for options granted to certain key ARC personnel during 2003. (PX 114, at 25.) He then multiplied this price by the number of units outstanding, as reported in the 2003 financial statements in ARC's registration statement (35,487,500), and estimated the aggregate fair value of the membership units at $196,956,000. Consistent with the general rule for computing EV, Aronow added long-term debt, capital leases and preferred stock (aggregating $385,131,000), subtracted cash and cash equivalents (aggregating $17,315,000), and derived an EV, as of December 31, 2003, of $564,772,000. (PX 114, at 26; Tr. (4/24) 78-83.)

Using these results, Aronow worked out ARC's EBIT multiple to be 9.1.[15] In other words, every dollar of incremental EBIT translated into a $9.10 increase in ARC's EV. In his final computation for the Primary Component, Aronow multiplied the estimated incremental EBIT ($1,022,000) by the EBIT multiple (9.1), and concluded that ARC's EV increased by $9,300,000 based upon the business attributable to the Debtor's customers taken by ARC. (PX 114, at 28; Tr. (4/24) 85-86.) This represented the benefit to ARC from taking these customers. (Tr. (4/24) 54-55; PX 114, at 7.)

---

[15]     Aronow computed ARC's Adjusted EBIT for the year ended December 31, 2003, as $61,995,000. He ignored the effect of the early extinguishment of an approximate $15 million debt. (PX 114, at 26 & Ex. 3.) If he had included the loss, the EBIT would have been $15 million less. Since the EBIT multiple is computed by dividing the EV by the EBIT, the inclusion of the loss would have lowered the denominator and resulted in an artificially inflated EBIT multiple to 12.0 (PX 114, at 26 n.1.) In other words, ARC's enterprise value would have increased at a greater rate for every dollar of EBIT. The use of the smaller multiple resulted in a lower estimated benefit to ARC, and hence, a smaller damage calculation.

Aronow derived many of his ratios and multiples from the information included in ARC's public documents. This was the best available information at the time that he prepared his report. At trial, Legg recalculated some of Aronow's margins and ratios, relying on a 2003 BPI balance sheet that had not been produced and was not identified in the JPTO.[16]  Because BPI rather than ARC acquired the business, the ratios and margins derived from the BPI information yielded a more accurate estimate. Using Aronow's methodology, Legg testified that BPI's incremental EBIT margin was 16.6% rather than the 18.9% figure used by Aronow. (See Tr. (4/25) 66-73.) This would result in a Primary Component damage calculation of $8,164,793, rather than Aronow's estimate of $9.3 million,[17] and I find the Primary Component damages to be this amount.

**The Remainder Component**

Aronow's second damage calculation, the Remainder Component, estimated the loss of earnings attributable to those customers that the defendants did not take but the Debtor could no longer service. His goal was to calculate the amount that a competitor would have paid the Debtor for this business. (Tr. (4/24) 86-87.) Initially, Aronow calculated the net sales attributable to these customers. From May through September 2003, the Debtor averaged monthly net sales in the amount of $980,000, or $11,760,000 on an annualized basis as of September 26, 2003. (PX 114, at 11.) Aronow ignored the sales made during the earlier part of 2003. The Debtor's sales were declining, and his focus on the last months of operation assured that he did not use inflated sales figure. (Tr. (4/24) 88-89.) He then subtracted $253,000, the net sales that the Debtor actually made—and hence, did not lose—during October through

---

[16]    I overruled the Trustee's belated motion to strike Legg's "valuation" testimony. (See TR (4/25) 64-66.)

[17]    The revised Primary Component damage calculation can be deduced by substituting 16.6% for the 18.9% that appears as the "Estimated Incremental EBIT Percentage" in Table 12 on page 28 of Aronow's report (PX 114.)

December 2003, to get to an adjusted annualized net sales figure of $11,507,000. [18]  (PX 114, at

11-12; Tr. (4/24) 90.)

The annualized net sales figure included the sales that would have been made to the

customers taken by BPI.  This loss was computed as part of the Primary Component.  To avoid

double counting, Aronow subtracted $5,405,000, and arrived at the net sales of $6,102,000 for

the Remainder Component.  (PX 114, at 16-17; Tr. (4/24) 87-91.)

Next, Aronow had to compute the value that a buyer would have garnered from the

business.  The first step involved the calculation of the Debtor's gross profit margin.  The

remaining customers included FM customers and customers who brought their work to the

Debtor's commercial shop at 902 Broadway.  Using the Debtor's 2002 internal financial

information, Aronow calculated a weighted-average gross profit margin of 30.3%, reflecting a

mix of FM and commercial shop customers.  (PX 114, at 18.)

To estimate the incremental EBIT, Aronow then had to deduct the direct costs associated

with the lost sales, the variable SG&A.  The Debtor's accounting system provided limited

information, and Aronow was not able to compute the incremental costs attributable to these

sales.  (PX 114, at 21.)  As a result, he computed the Debtor's SG&A, which included both fixed

and variable costs, as a percentage of net sales based on the 2002 operating results, and arrived at

28.8%.  (PX 114, at 23.)  Because this number reflected fixed as well as variable costs, the

variable SG&A was overstated, and accordingly, the estimated incremental EBIT margin was

understated.  (See PX 114, at 21.)

---

[18]     This estimate, which is reasonable, implicitly rejects the defendants' argument that the Debtor would have
gone out of business and lost all of its customers anyway.  The Debtor had severe business problems, but was
operating when the defendants shut it down.  As a consequence of the Shutdown, the Debtor lost the chance to hire a
new manager and continue to operate, or alternatively, to sell an intact, ongoing business.

Aronow made two additional adjustments to this figure. He backed out certain 2002 expenses that a strategic buyer would not be likely to incur. These included Wiener's perks and compensation, the salaries paid to the departing managers, non-recurring professional fees relating to the sale of the Debtor and the Merrill debt, and the costs associated with a Long Island City lease that was expiring and would not be renewed. He added back an increased bad debt expense based on an evaluation of the collectibility of unpaid receivables. As a result of these adjustments, Aronow estimated the adjusted SG&A at 25.4%, subtracted this from the gross profit margin, and arrived at an estimated incremental EBIT multiple of 4.9%. (PX 114, at 21-23; Tr. (4/24) 92-98.)

The incremental EBIT signified that every dollar of sales attributable to the Remainder Component translated into additional EBIT of $.049. Aronow multiplied the net sales of $6,102,000 by the estimated incremental EBIT multiple (4.9%), and arrived at incremental EBIT in the amount of $299,000. (PX 114, at 28; Tr. (4/24) 100-01.) Service businesses are commonly sold based on a multiple of EBIT, and Aronow used 3.75, which approximated the multiple used in the LOI. (PX 114, at 27.) The application of the multiple to the incremental EBIT of $299,000 resulted in a value of $1,121,000. This number reflected the amount that a strategic buyer would pay for the remaining business, and hence, the damages that the Debtor suffered from the loss of the business. (See PX 114, at 27.) Finally, Aronow discounted that damage figure by 20% to reflect the inherent risk and uncertainty associated with the use of the projected information to calculate the Remainder Component. (Id.) This last calculation yielded Remainder Component damages of $897,000, and together with the revised Primary Component, I find, based upon Aronow's opinion as modified by Legg's testimony, that the Debtor suffered damages in the sum of $9,061,793.

39

### III.    Sam Rosenfarb

Merrill presented expert testimony from Sam Rosenfarb, whose report was received in evidence as PX 112.[19]  Rosenfarb essentially viewed the Debtor as a business consisting of the nine customers diverted by the Defendants.  Using the market approach, he concluded that the Debtor could have sold its business on September 26, 2003, for $1,620,000.  (PX 112, at 7.)  Under the income/capitalization of earnings approach, the business was worth $1,490,000 to a buyer.  (Id.)

Rosenfarb also opined on the value of the diverted business to ARC based on certain ratios extracted from the Debtor's records and ARC's publicly available financial information.  Starting with the same approximate $5.4 million in net sales, (see id. at 9), he estimated the Debtor's gross profit margin and ARC's SG&A, and reduced the SG&A by 60% to reflect ARC's variable costs as a percentage of SG&A.  (Id. at 10.)  These calculations led to an estimated EBIT that Rosenfarb multiplied by 11.7, and then discounted the result by 65% to reflect the difference in size between the Debtor and ARC.  He concluded, under this approach, that the diverted business was worth $4,480,000 to ARC.  (Id.)

Finally, Rosenfarb calculated the value of the diverted business based on the ratio of ARC's market value ($570.8 million) to annual revenue ($435,920,000).  That comparison yielded a ratio of 130%.  Rosenfarb multiplied the net sales ($5,406,785) by 130%, and discounted that result by 40% to reflect the difference in size between ARC and the Debtor.  Under this method, the calculated value was $4.2 million.  (Id. at 10-11.)

---

[19]    Mr. Rosenfarb is a managing director of RosenfarbWinters, LLC, a forensic accounting firm.  He is a certified public accountant, a credentialed business appraiser, and a certified fraud examiner.  (PX 112, App. D; Tr. (4/5) 3-5.)

On the whole, I find that Aronow's approach produced a more accurate estimate of the Debtor's damages. He considered all of the Debtor's former customers, and did not limit his analysis to the nine defectors. He took a conservative approach, and thereby lessened the chance of inflating his result. He explained how he calculated the various multiples, ratios and margins more precisely. Finally, the substitution of the BPI 2003 operating results for ARC's produced a more precise estimate of the value of diverted business.

Rosenfarb's analysis, on the other hand, had some unexplained gaps. To begin with, he made several assumptions that seemed arbitrary. For example, when computing the market value to a buyer, he reduced the diverted customer net sales by 50%, and then reduced the value by another 40%. (PX 112, at 7.) I understand why he made these deductions, but the percentages he used appear to be "seat of the pants" estimates rather than grounded in any specific data. In estimating the value of the diverted customers to ARC, he discounted the result by 65% under his first approach "to reflect the size differential between ARC and LFC." (Id., at 10.) He discounted the result by 40% under his second approach to reflect the same size differential. (Id., at 11.) The use of different discount percentages yielded consistent results under the two approaches ($4.2 million v. $4.48 million), suggesting that the choice of different percentages may have been driven by the desire to achieve consistent valuations.

In addition, Rosenfarb, like Aronow, used ARC's public information to compute several of the multiples. At trial, Legg used the BPI financial information to re-evaluate Aronow's Primary Component calculations, and produced a better estimate. Legg did not recalculate Rosenfarb's comparable analysis, and that information is not available. Under the circumstances, Aronow's opinion, as modified by the use of the BPI 2003 financial information, was the more credible one.

41

## IV.    Howard Brod Brownstein

The defendants presented expert testimony from Howard Brod Brownstein.[20]

Brownstein's opinion was unencumbered by any analysis.  In simplest terms, he opined that an

existing customer has little or no value, (Tr. (4/26) 47-48), and the Debtor's customer relations,

in particular, had no value, (Tr. (4/26) 68-69), primarily because they were at-will customers:

According to Brownstein:

> [T]o the extent BPI acquired anything, what they acquired was a hatful of
> possibilities.  There was no guarantee that they would maintain these customers.
> There was no guarantee that these customers wouldn't, for the reasons that had
> nothing to do with the quality of ARC service, go elsewhere.  They were free to
> do so.  And so, to impute some long-term cash flow and then discount it back or
> apply capitalization factors is what we used to call garbage in garbage out when
> we did financial analysis at the Wharton School.

(Tr. (4/26) 53.)

After criticizing the income approach, Brownstein leveled his attack on the use of EBIT

multiples as a valuation tool:[21]

> Implicit in each of these multiple cap rates, discount rates, is risk and return.  You
> ask yourself, if this were traded on the New York stock exchange, would I buy it
> given what they're selling it for? And if you analogize it to a business with this
> much risk, would you accept this amount of return?  And the answer is absolutely
> not.  A group – a small group of customers with no long-term contracts, what risk
> is there in that?  Enormous risk.  So to even talk about anything long-term and
> start with multiples which apply to a whole huge enterprise of hundreds of
> millions of dollars, it's just ridiculous.

(Tr. (4/26) 54.)

---

[20]    Brownstein is a crisis and turnaround manager with the firm of NachmanHaysBrownstein, Inc.  He has a
law degree from Harvard University and an MBA from Harvard Business School.  He is a certified turnaround
professional.  (Tr. (4/26) 36-40.)  His report was not offered or received in evidence.

[21]    The question posed to Brownstein sought to distinguish between the valuation of customers and the
valuation of businesses.  In light of Brownstein's rationale, I fail to see any distinction.  The customers are the
business; without net sales to customers, the business has no value.

Brownstein's demeanor was that of an advocate rather than an expert, and his opinion ignored actual practice. People change their doctors, lawyers and accountants just as architects and engineers change their reprographic service providers. Yet professional practices are often bought and sold. Brownstein attempted to explain the contradiction, opining that an accountant's client is "very wedded" to his accountant, (Tr. (4/26) 49), and "I think those kind of clients would tend not to be as likely to move." (Id., at 50.) He ignored the fact that the Debtor had been servicing some of its customers for more than 30 years. In any event, a professional's clients, like reprographics customers, do move. While their reluctance to do so may increase the multiple of revenues used for valuation purposes, it undercuts Brownstein's core theory that "at-will" customers have no value.

More important, Brownstein's theory ignored the reality of ARC's own business practices. During the past eight years, ARC has acquired approximately 90 reprographics companies. (Tr. (4/25) 5-6.) It typically pays approximately four times EBIT. (Tr. (4/25) 9-10, 130.) In short, the value of a reprographic business is derived from its EBIT, and EBIT is determined by sales to customers. Moreover, the defendants were already managing the Debtor, had locked up Wiener with an employment agreement, had taken possession of the Debtor's personal property, were in contact with the Debtor's customers, and were armed with the Debtor's confidential information relating to those customers. Suffice it to say, the defendants were in place to effect a smooth transition, and reduced the risk to them that a prospective buyer might otherwise face.

Accordingly, I reject Brownstein's opinion.

### c.       Pre-Judgment Interest and Punitive Damages

The Trustee is also entitled to an award of pre-judgment interest.  Pre-judgment interest is

governed by § 5001 of New York's Civil Practice Law & Rules ("CPLR").  Section 5001(a)

states:

> Interest shall be recovered upon a sum awarded because of a
> breach of performance of a contract, or because of an act or
> omission depriving or otherwise interfering with title to, or
> possession or enjoyment of, property, except that in an action of an
> equitable nature, interest and the rate and date from which it shall
> be computed shall be in the court's discretion.

(McKinney's 1992).  The statutory pre-judgment interest rate is fixed at 9% under CPLR 5004.

The Trustee is entitled to recover interest at that rate on his legal claims as a matter of right, and

I will also award interest at the same rate on the Trustee's equitable restitution claims.  In

addition, I will use September 15, 2003, as the date to begin computing interest on both types of

claims.

The Trustee is also entitled to punitive damages.  Under New York law, punitive

damages may be awarded in tort if one of the following elements is shown:  (1) intentional or

deliberate wrongdoing; (2) aggravated or outrageous circumstances; (3) a fraudulent or evil

motive; or (4) a conscious act that willfully and wantonly disregards the rights of another.  Don

Buchwald & Assocs. v. Rich, 723 N.Y.S.2d 8, 9 (N.Y. App. Div. 2001) (upholding award of

punitive damages for tortious interference with contract and breach of fiduciary duty claims);

Swersky v. Dreyer & Traub, 643 N.Y.S.2d 33, 38 (N.Y. App. Div. 1996); see Carvel Corp. v.

Noonan, 350 F.3d 6, 24 (2d Cir. 2003).  The amount of the punitive damage "imposed on a

defendant should reflect the 'enormity of his offense.'"  BMW of N. Am. v. Gore, 517 U.S. 559,

575 (1996) (quoting Day v. Woodworth, 54 U.S. 363, 13 How. 363, 371 (1851).)  "This principle

reflects the accepted view that some wrongs are more blameworthy than others . . . trickery and

deceit are more reprehensible than negligence." BMW, 517 U.S. at 576 (internal quotation marks and citations omitted).  Further, punitive damages may be imposed for the purpose of deterrence.  See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 438-39 (2001).

Here, the defendants' intentionally, deliberately and consciously disregarded the Debtor's rights to maintain and use its customer and business information for its own benefit.  The evidence shows that the defendants made a calculated decision that it was cheaper to steal the Debtor's business than pay for it.  They effectively drove the Debtor out of business, and used the information they obtained to step in immediately to service numerous FM locations using the Debtor's former on-site employees.  Thereafter, ARC strung the Trustee along, with statements of interest in buying the customer relations, while ARC and BPI cemented those relationships.  The imposition of punitive damages will punish their conduct, and hopefully deter others from abusing positions of trust.

The final consideration is the amount of the award.  The Trustee requested $2 million in his post-trial submissions.  In light of ARC's financial wherewithal and the damages proven by the Trustee, a larger award would be justified.  Nevertheless, the Court feels constrained by the Trustee's request, and awards $2 million in punitive damages.

### 2.     The Trustee's Other Claims

#### a.     Unjust Enrichment

The Trustee has asserted a claim for unjust enrichment, and seeks to recover an amount that corresponds to the Primary Component damages.  The elements of an unjust enrichment claim under New York law are (1) a benefit to the defendant (2) at the plaintiff's expense, which

45

(3) in "equity and good conscience" should be restored.  <u>Kaye v. Grossman</u>, 202 F.3d 611, 616

(2d Cir. 2000).  Quasi-contractual claims such as unjust enrichment are barred if a written

contract between the parties governs the subject matter of their dispute.  <u>Briggs v. Goodyear Tire</u>

<u>& Rubber Co.</u>, 79 F. Supp. 2d 228, 236 (W.D.N.Y. 1999); <u>Gidatex S.r.L. v. Campaniello</u>

<u>Imports, Ltd.</u>, 49 F. Supp. 2d 298, 301 n.4 (S.D.N.Y. 1999); <u>Nelson v. Stanley Blacker, Inc.</u>, 713

F. Supp. 107, 111 (S.D.N.Y. 1989); <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 516 N.E.2d

190, 193 (N.Y. 1987).

This claim is subsumed within the Trustee's claim for breach of fiduciary duty.  The

defendants took over a substantial number of the Debtor's customers in breach of their fiduciary

duties, and must make restitution.  Furthermore, the Primary Component damages, as modified,

reflect the benefit to the defendants.  Although the parties did have a contractual relationship, the

wrongful conduct that formed the basis of the breach of fiduciary duty and unjust enrichment

claims occurred after ARC terminated the Management Agreement.  Hence, the Management

Agreement does not cover the subject matter of the unjust enrichment claim.  Accordingly, the

Trustee is entitled to judgment against the defendants on his unjust enrichment claim in the

amount of $8,164,793, together with interest at the annual rate of 9% from September 15, 2003.

### b.     Breach of Contract

Under New York law, the party asserting a breach of contract claim must prove  (1) the

existence of a valid contract; (2) the performance of the contract by the plaintiff; (3) a breach by

the defendant; and (4) damages.  <u>First Investors Corp. v. Liberty Mut. Ins. Co.</u>, 152 F.3d 162,

168 (2d Cir. 1998).  The Management Agreement was a valid contract, and I find that the Debtor

performed its material obligations.  With one exception, the Trustee failed, however, to prove

that ARC breached the Management Agreement.

The Trustee's claims of breach centered on the shutting down of the business without notice, the firing (and rehiring of the employees), the misappropriation of confidential business information in computer and hard copy format, and the transferring of the Debtor's fax and phone lines to BPI's premises.  (See Plaintiffs' Proposed Findings of Fact, dated May 25, 2006, at ¶ 250)(ECF Doc. # 61.)  The Management Agreement granted ARC access to the Debtor's confidential business information, customers and employees, and there was no proof that either defendant improperly used this grant of access prior to the termination of the Management Agreement.  Furthermore, the short-lived turnaround plan contemplated the physical and administrative consolidation of the Debtor's operations with those of BPI.  The wrongful conduct that forms the basis of the breach of fiduciary duty claim occurred after the termination of the Management Agreement.

The exception – a significant one -- concerned the breach of the notice provisions.  As discussed, the Management Agreement provided that notices had to be sent to the Debtor and to the Debtor's counsel.  The Termination Letter was such a notice, but I find from the evidence that ARC never sent a copy to the Debtor's counsel.  Moreover, the omission caused damage to the Debtor.  It appears that Pat Kubinski, a consultant and BPI's job offeree, was the only one who saw it, and there is no evidence suggesting that it was brought to the attention of a manager or officer of the Debtor.  The termination remained a secret, and allowed the defendants to remain in control.  It was during this period that they committed the various breaches set out above.

I find that the Debtor suffered damages in the sum of $1,691,529 as a result of the breach, based upon an extrapolation of Aronow's damage analysis relating to the Remainder Component.  Initially, Aronow projected annual sales in the amount of $11,760,000, as of

September 26, 2003, and then reduced that projection by $253,000 – to $11,507,000 – based on the net sales that the Debtor actually made during the next three months.  (PX 114, at 11-12.) Aronow then backed out the sales covered by Primary Component calculations to avoid double counting.  This left Remainder Component net sales in the sum of $6,102,000.

Damages for breach of contract are designed to compensate the Estate for its loss rather than for the benefit realized by the defendants.  The Remainder Component measured those damages, albeit minus the nine defectors.  As a result of the breach of contract, the defendants were able to destroy the Debtor's remaining business, and the injury sustained by the loss of all of the customers, including the nine defectors, is measured through the same approach used to estimate the Remainder Component damages.  As summarized in Table 12 of Aronow's report, (PX 114, at 28), this involves first multiplying the total lost sales ($11,507,000) by 4.9% (the Estimated Incremental EBIT Percentage), and arriving at an Estimated Incremental EBIT of $563,843.  The Estimated Incremental EBIT is multiplied by 3.75 (the EBIT Multiple), and the product is then reduced by 20%.  These computations result in a damage calculation of $1,691,529.  The Estate is, therefore, entitled to judgment against ARC in the sum of $1,691,529, plus interest from September 15, 2003, the date of the breach.

### c.    Lanham Act

The Trustee charged the defendants with violating § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), which provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to

48

the origin, sponsorship, or approval of his or her goods, services, or commercial
activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or another person's
goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is
likely to be damaged by such act.

In <u>Resource Developers, Inc v. Statue of Liberty-Ellis Island Found., Inc.</u>, 926 F.2d 134

(2d Cir. 1991), the Court explained the distinction between the two subparagraphs as well as how

the remedy sought dictates what must be proved:

> [Section 43(a)] provides for two distinct causes of action: false designation of
> origin or source, known as "product infringement," and false description or
> representation, known as "false advertising." <u>Johnson & Johnson v. Carter-
> Wallace, Inc.</u>, 631 F.2d 186, 188 (2d Cir.1980); <u>see also</u> <u>Note, Monetary Relief
> for False Advertising Claims Arising Under Section 43(a) of the Lanham Act</u>, 34
> UCLA L.Rev. 953, 965 (1987).  When a plaintiff seeks money damages in either
> a product infringement case or a false advertising case asserted under section
> 43(a), the plaintiff must introduce evidence of actual consumer confusion. <u>E.g.</u>,
> <u>PPX Enterprises</u>, 818 F.2d at 271-72; <u>Warner Bros., Inc. v. Gay Toys, Inc.</u>, 658
> F.2d 76, 79 (2d Cir.1981). This requirement must be distinguished from cases
> brought under the Lanham Act in which only injunctive relief is sought; in those
> cases the plaintiff need only prove a likelihood of confusion among consumers.
> <u>PPX Enterprises</u>, 818 F.2d at 271.

Here, the only specific evidence offered by the Trustee concerned a September 29, 2003

letter that McMenamey wrote on the Debtor's letterhead, which also bore the Debtor's logo, to

Robert Buford.  Buford was the managing partner of Robert A.M. Stern Architects ("RAMSA"),

a long-time customer of the Debtor.  (PX 41.)  The letter solicited RAMSA's business for BPI.

It stated that "BPI is currently doing your outsource work and will continue to do so as we are

doing with all other Louis Frey accounts."  The letter further stated, "Louis Frey would like to

formalize this temporary relationship with BPI as quickly as possible for the benefit of all

involved." Finally, RAMSA would be "billed according to the current Louis Frey price

structure." McMenamey signed the letter under the Debtor's typed name.

Without doubt, McMenamey had no right to use the Debtor's letterhead, sign as a

representative of the Debtor or suggest that his proposal for a temporary relationship reflected an

agreed arrangement with the Debtor. By September 29th, the Management Agreement had been

terminated, McMenamey had returned to work for BPI, and he had no authority to speak for the

Debtor or use the Debtor's name or stationary. Furthermore, BPI had no authority to service the

Debtor's business on an "outsource" basis.

Nevertheless, the letter did not cause confusion or misrepresent who, as between BPI and

the Debtor, would provide reprographic services on a going-forward basis. It made clear that

BPI was servicing RAMSA, and this was unquestionably true. Moreover, while acknowledging

the "lack of clarity"— RAMSA was an FM site, and the same personnel continued to provide the

on-site reprographic services — Buford's principal concerns were potential liability for use of

the Debtor's equipment and claims by "the players that were involved in the account." (Tr. (4/5)

118.)

Buford wrote back on October 7th, proposing an interim agreement. Among other things,

the Debtor's equipment would remain on RAMSA's premises for the time being, but BPI would

remove it upon RAMSA's request. In addition, BPI would employ the on-site personnel, and

allocate certain payments for services between the Debtor and BPI. Lastly, BPI would defend,

indemnify and hold RAMSA and its partners, employees and agents harmless from any claims

asserted by the Debtor. (PX 20.) The letter was signed by BPI, and was also signed on the

Debtor's behalf by Wiener, as president. (PX 43.) By then, however, Wiener had resigned from

the Debtor and was working for BPI. I infer from the circumstances that BPI induced Wiener to sign on behalf of the Debtor.

The Trustee failed to prove his Lanham Act claims at trial, and accordingly, they are dismissed.

### d.      Misappropriation of Trade Secrets

Under New York law, the party asserting a claim for misappropriation of trade secrets "must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999). The plaintiff may recover restitution from the wrongdoer. 2 DOBBS § 10.5(3), at 690-91.

The Trustee's trade secret claim overlaps with the unjust enrichment claim and the Primary Component portion of the breach of fiduciary duty claim. "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." North Atl. Instruments, 188 F.3d at 44; Defiance Button Machine Co. v. C & C Metal Prods. Corp., 759 F.2d 1053, 1063 (2d Cir.), cert. denied, 474 U.S. 844 (1985). For the reasons already stated, I find that the Debtor's customer and pricing information were not well known, and were not ascertainable absent access to the Debtor's business records. The defendants acquired this information, used it to contact the Debtor's customers and stepped in to take over the FM business at the precise moment of the Debtor's demise – a demise triggered by the Shutdown. The use of that information constituted

51

a misappropriation of the Debtor's trade secrets, and the Estate is, therefore, entitled to judgment

in the sum of $8,164,793, in a ddition at the annual rate of 9% from September 15, 2003.

### e.    Common Law Fraud

A claim for common law fraud under New York law requires clear and convincing proof

of five elements: (1) a material, false representation by defendant; (2) made with knowledge of

its falsity; (3) with an intent to defraud, (4) upon which the plaintiff reasonably relied; and (5)

suffered damages.  MacDraw, Inc. v. CIT Group Equip. Fin., 157 F.3d 956, 960-961 (2d Cir.

1998); see Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999); Katara v. D.E. Jones

Commodities, Inc., 835 F.2d 966, 970-71 (2d Cir. 1987).  The misrepresentation may be an

affirmative misstatement, or the failure to disclose a material fact where there is a duty to speak.

Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 47 (2d

Cir.1993); 60A NEW YORK JURISPRUDENCE 2D, FRAUD AND DECIT, § 15, at 45 (2001).

The Trustee failed to prove that the defendants made any affirmative misrepresentations

to the Debtor or to the Trustee.  Although it appears that ARC continued to stoke the Trustee's

hope of a sale while it cemented its relationships with the Debtor's former customers through the

Interim Agreements, I do not find clear and convincing evidence that it represented an absolute,

non-contingent intention to buy the Debtor's customers.  On the other hand, the failure to

communicate the termination of the Management Agreement coupled with the continued

management of the Debtor implied that the Management Agreeement was still in effect, although

this may simply constitute a breach of contract rather than the type of independent tort necessary

to sustain a fraud claim.  See Sommer v. Federal Signal Corp., 593 N.E.2d 1365, 1369 (N.Y.

1992)(a breach of contract cannot sustain a tort claim in the absence of a breach of a duty

independent of the contract); accord Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d

190, 193 (N.Y. 1987).

In any event, the Trustee failed to prove that the Estate suffered damages as a result of the

fraud.  New York law does not permit recovery of the benefit of the bargain in fraud actions; the

victim of a fraud may only recover its out-of-pocket losses.  Ostano Commerzanstalt v. Telewide

Sys., Inc., 794 F.2d 763, 766 (2d Cir. 1986); Int'l Motor Sports Group, Inc. v. Gordon, No. 98

CIV 5611(MBM), 1999 WL 619633, at *9 (S.D.N.Y. Aug. 16, 1999); Kaddo v. King Serv., Inc.,

673 N.Y.S.2d 235, 237 (N.Y. App. Div. 1998).  The Trustee failed to show the amount of out-of-

pocket losses that it sustained.  I note in this regard, that the Trustee has not pointed me to any

specific evidence that the Estate actually paid fees under the Management Agreement for any

period after the termination of the Management Agreement.  Accordingly, the fraud claim is

dismissed.

### f.      Unauthorized Post-Petition Transfers

The Trustee seeks to avoid and recover approximately $5 million based on certain post-

petition transfers received by the defendants.  This claim requires the consideration of four

provisions of the Bankruptcy Code.  Initially, § 549(a) governs the avoidance of post-petition

transfers.  It provides:

> Except as provided in subsection (b) or (c) of this section, the trustee may avoid a
> transfer of property of the Estate – (1) that occurs after the commencement of the
> case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title;
> or (B) that is not authorized under this title or by the court.

Section 101(54), in turn, broadly defines a "transfer" to include

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary,
> of disposing of or parting with property or with an interest in property, including
> retention of title as a security interest and foreclosure of the debtor's equity of
> redemption.

Next, § 550(a) allows a trustee to recover the transferred property, or its value:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the Estate, the property transferred, or, if the court so orders, the value of such property, from - (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

Finally, § 502(d) disallows the transferee's claim until it returns the avoided transfer.   Section 502(d) states:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

The Trustee points to three unauthorized post-petition transfers.  First, the defendants "continued to use the Debtor's assets, including the machinery, inventory and supplies, to operate certain of the off-site customer locations."  (JPTO ¶ 61.)  Second, the defendants uploaded the Debtor's customer and pricing information.  Third, the defendants caused hard copies of the Debtor's business information to be transferred to BPI's offices.  (See Plaintiff Trustee's Post-Trial Memorandum of Law, dated May 25, 2006, at 34-36)(ECF Doc. # 62.)

Unfortunately, the Trustee's contentions raise difficult legal questions, his post-trial memorandum did not cite any legal authority, and the Court's own, brief research did not find any answers.  For example, the Trustee failed to support the legal proposition that the unauthorized appropriation and use of confidential business information – computerized or hard copy -- is a "transfer," i.e., that it disposes of or parts with an interest in property.  A similar

54

question arises in connection with the unauthorized <u>use</u> of the Debtor's physical assets – the machinery, inventory and supplies at the FM locations.  Although the unauthorized use may give rise to tort and quasi-contract claims, it does not follow that it constitutes a "transfer" within the meaning of § 101(54).

A related question concerns the value of the "transfers."  The Debtor's paper files presumably had minimal if any value; it was the information on them that was valuable.  Similarly, the physical assets used by the defendants had little value.  In any event, the Trustee failed to prove their value.  Instead, the Trustee is essentially seeking to use the concept of "value" in § 550 as an alternative remedy for unjust enrichment.  The Trustee failed to provide a legal justification for that interpretation of § 550.

Accordingly, the Trustee's claim to avoid and recover the post-petition transfers is dismissed.  Furthermore, since he has failed to demonstrate an avoidable post-petition transfer, he cannot invoke § 502(d) to disallow any claims filed by the defendants.

**B.    Merrill's Claims**

**1.    The Derivative Claims**

Earlier in this opinion, the Court observed that Merrill's first three claims sounding in the willful and malicious conversion of its collateral, the tortious interference with the contractual relations between the Debtor and its customers, and the defendants' unjust enrichment, were derivative of the Estate's claims.  Merrill's theory is that it had a security interest in all or substantially all of the Debtor's property, Merrill was oversecured, the defendants damaged the Debtor's property (and Merrill's collateral), and Merrill is entitled to recover the unpaid portion of its Loan from the defendants.  The recovery would duplicate the Trustee's recovery, because

the Estate seeks to recover all of its damages, including the damage to the portion of its assets that collateralized Merrill's loan.

Previously, the Court had denied an earlier motion to dismiss Merrill's claims and concluded that it had standing to sue for the conversion of its collateral and the tortious interference with the contractual relations between the Debtor and its customers.  Upon default by the Debtor, Merrill was entitled to possession of its collateral, and could assert those rights against a third party in possession.  See Bank of India v. Weg & Myers, P.C., 691 N.Y.S.2d 439, 445 (N.Y App. Div. 1999); Long Island Trust Co. v. Porta Aluminum Inc., 370 N.Y.S.2d 166, 168 (N.Y. App. Div. 1975).  The decision left open the practical problem of how to divide the proceeds of any recovery, although the parties' subsequent stipulation, discussed below, resolved that issue.

While Merrill survived the motion to dismiss, it failed, at trial, to prove its entitlement to recover directly on its three derivative claims.[22]  First, it did not identify which of its collateral was damaged, or how.  The trial evidence showed that most of the Debtor's equipment was leased, the Trustee eventually recovered and sold the Estate-owned equipment, and although the Debtor was slow in billing and collecting its accounts receivable, the delay was due primarily to the Debtor's own bookkeeping.  Moreover, bills were eventually sent, they were collected, and the loss, if any, due to the delay was never proven much less quantified.  Furthermore, Merrill did not show that its security interest reached the Debtor's future business, i.e., its prospective accounts receivable.  Thus, while the defendants' actions destroyed the Debtor's ability to

---

[22]      The Court reserved decision on the motion to dismiss Merrill's unjust enrichment claim.  The restitutionary nature of the relief distinguishes that claim from the more straightforward claims that grant Merrill standing for the injury to its collateral.

continue in business, and enabled BPI to succeed to much of the Debtor's future business,

Merrill did not connect that injury, legally or factually, with its claims.

Second, Merrill failed to prove the value of its collateral at the relevant times. The

defendants began to breach their fiduciary duties on September 15, 2003. Merrill relies primarily

on the Kinsella Report, (DX AW), to prove that Merrill was oversecured by $533,330, but the

Kinsella Report was not probative on this point. It spoke as of August 22, 2003, but the breaches

occurred three weeks later. More important, Kinsella made certain value assumptions that have

not been borne out. Most notably, it valued the Debtor's fixed assets at $840,000. After

conversion, the Trustee conducted a rolling auction of the equipment, and recovered $150,000.

(Tr. (4/3 PM) 34.) I recognize that the liquidation sale of the equipment undoubtedly produced

less proceeds than a going concern sale, but there was no probative evidence of value conducted

on any other basis. The Kinsella Report also valued, at $100,000, a claim against Bruce secured

by an unperfected mortgage on his residence. There was no evidence that this claim had any

value. In short, Merrill failed to prove the value of its collateral, or that it was oversecured, as of

September 15, 2003, and it is not, therefore, entitled to a judgment in the amount of its

deficiency claim.

Nevertheless, Merrill's claims have been rendered academic by virtue of its stipulation

with the Trustee. The parties have agreed that all of the recovery will be paid into the Estate, and

that Merrill's claim will be paid in accordance with the cash collateral orders and the order

approving the retention of special counsel. Accordingly, any recovery by the Estate is subject to

Merrill's rights under those orders. This also resolves the allocation problems already

mentioned.

2.      **Third Party Beneficiary**

Merrill also asserted a direct claim against ARC, contending that it was a third party beneficiary under the Management Agreement.  The party asserting a claim for breach of contract as a third party beneficiary must establish "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost."  Burns Jackson Miller Summit & Spitzer v. Lindner, 451 N.E.2d 459, 469 (N.Y. 1983); accord Mendel v. Henry Phipps Plaza West, Inc., 844 N.E.2d 748, 751 (N.Y. 2006).

New York has adopted the third party beneficiary test set out in § 302 of the Restatement (Second) of Contracts.  See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir. 1991); Septembertide Publ'g, B.V. v. Stein & Day, Inc., 884 F.2d 675, 679 (2d Cir. 1989); Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 485 N.E.2d 208, 212 (N.Y. 1985).   Under the Restatement test, only "intended beneficiaries" have standing to sue for a breach; "incidental beneficiaries" lack standing.  The beneficiary is intended "if recognition of the right to performance in the beneficiary is appropriate to effectuate the intention of the parties," and either (a) the promisor's performance will satisfy an obligation of the promisee to pay money to the beneficiary, or (b) "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  RESTATEMENT (SECOND) OF CONTRACTS § 302 (1) (1981); accord Fourth Ocean Putnam Corp., 485 N.E.2d at 212.  "[T]he obligation to perform to the third party beneficiary need not be expressly stated in the contract," Trans-Orient Marine Mktg. Corp., 925 F.2d at 573; accord Vista Co. v. Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1296 (S.D.N.Y. 1989) , and the court may examine the

surrounding circumstances as well as the agreement.  <u>Trans-Orient Marine Corp.</u>, 925 F.2d at 573.

Here, Merrill was not the intended beneficiary; it was the 800 pound gorilla.  ARC's performance under the Management Agreement did not satisfy an obligation owed by the Debtor to Merrill.  Furthermore, the Management Agreement refers to Merrill in only one place.  It includes a disclaimer that states "ARC does not guaranty that the cash flows and profits of the Business will be sufficient to pay Frey's creditors, including Merrill Lynch Business Financial Services, Inc." (Management Agreement § 10.)  Finally, the surrounding circumstances do not indicate an intention to benefit Merrill.  Rather, the circumstances show that ARC recognized Merrill's leverage – the Debtor was in default and Merrill could pull the plug at any time.  ARC wanted Merrill's consent to the arrangement because it made no sense to invest its own resources in the face of a threatened foreclosure by Merrill.  (<u>See</u> Deposition of Kumarakulasingam Suriyakumar, held Dec. 8, 2004, at 89-90) ("Suri Dep.").

ARC was hoping to turn the Debtor's fortunes around and allow Merrill to be paid, but this objective did not transmute Merrill from an incidental beneficiary into an intended one.  The purpose of any turnaround plan is to operate profitably, pay creditors, and distribute value to the owners.  If Merrill was an intended beneficiary, every creditor of the Debtor as well as Wiener were also intended beneficiaries.  This, however, was not the case, and Merrill's third party beneficiary claim is dismissed.

C.      **ARC's Counterclaims**

1.      **Claim Against Merrill**

ARC contends that Merrill strung it along, allowed ARC to accrue expenses in connection with the Management Agreement, but all the while, harbored an undisclosed intent to liquidate its collateral, and along with it, the Debtor.  In particular, Merrill misled ARC to believe, on June 4, 2003, that it had accepted a three-year forbearance agreement, and induced ARC to pay for the Kinsella Report and manage the Debtor although ARC was not collecting its management fee.  (See Defendants' Proposed Findings of Fact, dated May 24, 2006, at ¶¶ 66-80)(ECF Doc. # 64.)

No credible evidence supported the counterclaim.  Initially, ARC signed the Management Agreement before June 4, 2003.  Hence, it was not induced to manage the Debtor based upon a forbearance agreement with Merrill.

On June 5, 2003, one day after the supposed agreement, Merrill and the Debtor entered into a forbearance agreement that only ran until July 31, 2003.  (PX 118.)  On June 27, 2003, Suri sent an e-mail to Gary Stewart, a Merrill loan officer, expressing shock that Merrill did not believe that the parties had reached a three-year forbearance agreement.  (DX BC.)  Suri added that ARC was not interested in managing the Debtor without a forbearance agreement, and asked Stewart to let him know his understanding.  (Id.; accord DX BD.)

Stewart responded the same day.  He advised Suri that "[w]e do not have an agreement as to any repayment."  (DX BD.)  He stated that they discussed the concept, but ARC needed to manage the Debtor and determine whether it wanted to purchase it.  In addition, Merrill needed information about the Debtor before determining a reasonable price.  (Id.)

The parties continued to negotiate.  On August 7, 2003, Merrill made a contingent offer to ARC.  Merrill would grant the Debtor three years to repay the Merrill debt, without interest, at the monthly rate of $127,382.06.  If ARC bought the Debtor and returned it to profitability, Merrill would receive a $200,000 "interest recovery fee."  Finally, Merrill's acceptance was dependent on a third party "consultant's evaluation of the collateral, unsecured creditors/vendors and the proposed repayment plan."  (DX BF.)

Mark Crady apparently replaced Stewart.  ARC makes much of Crady's August 19 notes indicating that a forbearance agreement had been reached with ARC, subject however, to a consultant's report.  (DX BG.)  Yet there was no evidence that ARC accepted Merrill's August 7th proposal, and Crady's notes contradicted the documentary evidence.  In any event, everything was subject to a consultant's report that had not been rendered.  Three days later, the same date that the Kinsella Report was issued, Suri put the Debtor into bankruptcy, terminating any chance for an out of court deal.

The Court finds based on the foregoing that Merrill and ARC (or Merrill and the Debtor) did not enter into the forbearance agreement that extended beyond July 31, 2003, before the Debtor filed bankruptcy, and Suri had no reasonable basis to believe that they did.  ARC also failed to prove the damages that it contends it suffered.  ARC did not pay Kinsella's fee; the Debtor did.  (Suri Dep. at 121.)  Furthermore, the various cash collateral orders provided for the payment of ARC's post-petition management fees through the Shutdown Day, and Legg could not explain why he did not cause the Debtor to pay them.  (Tr. (4/25) 81.)  Finally, ARC received its pre-petition management fees but agreed to return a portion to settle a preference claim asserted by the Trustee as part of this adversary proceeding.

Accordingly, ARC's counterclaim against Merrill is dismissed.

### 2.        Claims Against the Estate

ARC's remaining counterclaim against the Estate sounds in trade defamation.  Under

New York law, the tort of trade defamation involves the "knowing publication of a false matter

derogatory to the plaintiff's business calculated to prevent or interfere with relationships between

the plaintiff and others to its detriment."  Jurlique, Inc. v. Austral Biolab Pty., Ltd., 590 N.Y.S.2d

235, 236 (N.Y. App. Div. 1992).  Defamation is often confused with "product disparagement" or

"injurious falsehood," but the two torts are distinct and require different proof:

> Now, although defamation and disparagement in the commercial context are
> allied in that the gravamen of both are falsehoods published to third parties, there
> is a distinction. Where a statement impugns the basic integrity or creditworthiness
> of a business, an action for defamation lies and injury is conclusively presumed.
> Where, however, the statement is confined to denigrating the quality of the
> business' goods or services, it could support an action for disparagement,
> but will do so only if malice and special damages are proven

Ruder & Finn Inc. v. Seaboard Surety Co., 422 N.E.2d 518, 522 (N.Y. 1981); accord

Henneberry, 415 F. Supp. 2d at 470-71; Drug Research Corp. v. Curtis Publ'g Co., 166 N.E.2d

319, 331-32 (N.Y. 1960).

ARC's counterclaim centers on the December 1, 2003 letter that the Trustee sent to the

Debtor's former customers.  (DX O.)  In general terms, the letter advised the customers about the

status of the chapter 7 case, and assured them that the Estate would continue to service customer

accounts until a customer (or vendor) transferred its account to a different reprographics

company.  The letter also stated that the Trustee had retained BWR "to manage all of the

customers' reprographics facilities until such time as they can be transitioned to someone other

than [the Debtor]."  The letter then added the following statement, which forms the basis of the

defamation claim:

62

> Please note that BWR is the <u>only</u> entity formally authorized by me to service customer accounts and shall continue to do so until such time as I have entered into agreements with customers, equipment lessors and reprographic services companies to replace LFC on a customer-by-customer basis.

The December 1st letter was written after the Trustee and ARC signed the Interim Agreements. According to ARC, although the letter did not mention ARC, "[t]he implicit statement that ARC was not authorized to do what it was then doing [under the Interim Agreements] inherently affected its business reputation adversely." (<u>Defendants' Memorandum</u>, at 31.) When ARC protested, the Trustee immediately sent a follow up letter, which was approved by ARC, on December 5th, (<u>see</u> DX AX), explaining that BPI could continue to service those former customers that had entered into Interim Agreements.

ARC's inference is a stretch, but more to the point, the statements in the December 1st letter were not false. The letter said, in substance, that BWR was the Trustee's exclusive representative, and would service the customer until it selected another provider. The customers that were the subjects of the Interim Agreements had selected ARC/BPI as their new provider. Hence, the December 1st letter did not pertain to them. At worst, the December 1st letter was confusing, but it was not defamatory. Any confusion was quickly clarified on December 5th.

Accordingly, the counterclaim against the Estate is dismissed.

## CONCLUSION

The defendants are jointly and severally liable to the Estate for damages in the sum of $8,164,793, plus Remainder Component damages of $897,000, for total damages of $9,061,793, plus interest at 9% per annum from September 15, 2003, to the date of the entry of judgment, plus punitive damages in the sum of $2 million, in addition to the costs and disbursements of this

adversary proceeding.  In addition, the Estate is entitled to an award against ARC that is

consistent with the stipulation settling the preference claims asserted in this adversary

proceeding.  Lastly, Merrill's claims and ARC's remaining counterclaim are dismissed.  The

foregoing constitutes the Court's findings of fact and conclusion of law.  The parties are directed

to settle a judgment consistent with this opinion.

Dated: New York, New York
        July 28, 2006

        /s/ *Stuart M. Bernstein*
        STUART M. BERNSTEIN
        Chief United States Bankruptcy Judge